**ELECTRONIC SPECIALTY CO., William H. Burgess and John B. Fitzpatrick, Plaintiffs,**

v.

**INTERNATIONAL CONTROLS CORP., Defendant.**

No. 68 Civ. 3434.

United States District Court
S. D. New York,
Civil Division.

Dec. 19, 1968.

Kaye, Scholer, Fierman, Hays & Handler, by Milton Kunen, and Jay G. Strum, New York City, for plaintiffs.

Cahill, Gordon, Sonnett, Reindel & Ohl, by David R. Hyde, New York City, and Hogan & Hartson, by Francis L. Casey,

Jr., and G. Richard Dunnells, Washington, D. C., for defendant.

Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Assoc. Gen. Counsel, and Warren K. Morgens, Washington, D. C., for Securities and Exchange Commission as amicus curiae.

LASKER, District Judge.

In this action alleging violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder and the new Sections 14(d) (1) and 14(e) of the 1934 Act [1] and Rule 14d–1 thereunder, plaintiffs move for a preliminary injunction to bar the defendant from voting the controlling stock of plaintiffs acquired by a tender offer, and defendant moves for summary judgment on the ground that none of the plaintiffs has standing to sue.

Plaintiff Electronic Specialty Co. (ELS) is a California corporation manufacturing electronic and aerospace components and systems. Its common stock (1,800,000 shares outstanding) is listed on the New York Stock Exchange.

Plaintiff William H. Burgess (Burgess) is Chairman .of the Board of Directors of ELS. When this action was commenced he owned approximately 129,-000 shares of ELS stock, of which he tendered all but 1,000 shares on September 11, 1968. He brings this action as representative of the class of present holders of common stock and debentures of ELS, i. e., the non-tenderers.

Plaintiff John B. Fitzpatrick (Fitzpatrick) tendered 100 of his 10,100 shares of ELS stock, and the tender was accepted by defendant. Fitzpatrick sues as representative of the class of former common stock and debenture holders of ELS who tendered their stock pursuant to defendant's tender offer.

Defendant International Controls Corp. (ICC) is a Florida corporation with its principal office in Fairfield, New Jersey. It manufactures parts for computers and aircraft, valves and controls, and it also runs certain airports providing charter plane service. Its stock is listed on the American Stock Exchange.

On August 19, 1968, ICC published in the Wall Street Journal, the New York Times, the Los Angeles Times and the San Francisco Chronicle its tender offer for 500,000 shares of the common stock and convertible debentures of ELS.[2] Pursuant to that offer, 1,038,946 shares of common stock and $5,210,000 in face amount of convertible debentures of ELS were tendered to ICC and purchased by it for a total of approximately $48,000,-000. As a result, ICC is the owner of approximately 55% of the voting stock of ELS.

On August 27, 1968, plaintiffs instituted this action by order to show cause, requesting a temporary restraining order barring the defendant from proceeding with what was then the unconsummated tender offer. On assurances of defendant that it would not consummate the offer before a hearing on a preliminary injunction took place, the application for a temporary restraining order was denied. Plaintiffs then moved for a preliminary injunction against the consummation of the tender offer, and an evidentiary hearing on the motion was held by Judge McLean. After three days of hearings, Judge McLean held: (1) that the written tender offer was misleading within the meaning of Section 10(b), Rule 10b–5, and Section 14(e) in that it contained a false statement re-

---

1. (37 U.S.L.Week 9 (1968)), which became effective July 29, 1968 and in substance makes the provisions of Section 10(b) and Rule 10b–5 applicable to tender offers.

2. ICC's offer reserved the usual rights to accept more or less than 500,000 shares if tendered, as well as the right to refuse to accept any shares if less than 500,000

were tendered or if litigation were commenced in connection with the tender. As indicated below, ICC later waived, or believed that it had waived, its so-called "litigation out" in view of continuing the tender offer in force after this litigation was commenced; and on September 9, 1968 it extended its tender offer, committing itself to accept all shares tendered.

lating to ICC's actual intentions to merge ELS with itself or its subsidiary; (2) that there was a reasonable probability that the plaintiffs would succeed at trial in establishing a violation of the statute and rule as to the allegations that defendant had engaged in manipulative practices aside from the language of the tender offer; and (3) that the corporate plaintiff had standing to sue.[3]

In spite of these findings, Judge McLean believed that the balance of equities required that no injunction should issue, since an injunction would prevent those ELS stockholders who wished to tender from doing so at what they might consider a favorable price. He pointed out that should ICC nevertheless proceed with a tender offer, ELS could, under the authority of Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840 (2d Cir. 1967), apply for an injunction against ICC's voting the ELS stock so acquired.

On September 9th (three days before Judge McLean's decision was rendered) ICC announced that it was opening its previously restricted tender offer to accept all shares tendered. It contends that it did so in order to facilitate the tendering of shares which were not then being tendered at a rate sufficient to enable it to purchase 500,000 shares (i. e., to acquire control).

Up to September 11th Burgess and the management of ELS had formally advised the stockholders of ELS that management would not tender its stock. However, on September 11th, after it had been announced that more than 500,000 shares (which would give working control) had been tendered to ICC, and because ICC had amended its tender offer to accept all shares tendered, Burgess and his colleagues advised stockholders that management would tender their shares and withdrew their "former recommendation that you not tender your shares."

As heretofore indicated, the result of the various actions, unanticipated on both sides, was that ICC acquired 1,038,-946 shares of ELS stock and $5,200,000 of its convertible debentures.[4] Although management's telegram to ELS stockholders indicated that Burgess would tender his shares, he actually tendered only 128,000 of the 129,000 shares he owned, and continues to own 1,000 shares.

On September 16th, ICC mailed to all tenderers, in the same envelope as the checks in payment for their stock, a "withdrawal offer" by which it gave to the tenderers the option of returning the checks and unconditionally recovering their stock. The withdrawal offer included as exhibits the full text of the complaint in this action and the full text of Judge McLean's opinion, stating in reference to the litigation:

"Specialty, William H. Burgess, its chief executive officer, and another stockholder have brought a lawsuit against International in the United States District Court for the Southern District of New York, seeking an injunction against International's Offer for the shares of Common Stock and

---

3. Since Judge McLean's excellent opinion describes *in extenso* the facts existing at the time of his hearing (i. e., until September 12), and since the parties have indicated the probability of an immediate appeal from the instant decision on the pending motions because the Superior Court of California has ordered a stockholders' meeting of ELS which is currently scheduled for December 30, this opinion will not attempt to describe in detail facts already set forth in Judge McLean's opinion.

4. ICC claims that the unexpected tenders made September 11–12 caused it to acquire substantially more ELS stock than it wanted. Its explanation for acquiring the stock, nevertheless, is that it believed in good faith, on advice of very well qualified counsel, that it had waived the "litigation out" of the original offer and that, even if this were not so, it would be faced with a multiplicity of suits by frustrated tenderers if it did not purchase the stock tendered. ICC claims that management's reversal of recommendation to its stockholders constituted "unclean hands" on the part of Burgess, et al., which should, under equitable principles, bar plaintiffs' application for a preliminary injunction. The defense of unclean hands is discussed below.

debentures of Specialty. A copy of the Complaint in that suit is annexed hereto as Exhibit A. International believes that this suit is without merit and that it will prevail at the trial of the action as it has in the two prior court actions brought by Specialty to restrain International from accepting and purchasing the tendered shares and debentures. However, in the interest of full disclosure and fairness to the tendering stockholders and debenture holders, International has concluded that it should offer them an opportunity to withdraw their tendered shares and debentures, and urges them in this connection to study the Complaint and consider the possibility that any or all of the charges made therein might be sustained in a trial of the action. It also calls their attention to the opinion of Judge Edward C. McLean, annexed hereto as Exhibit B, rendered on September 12, 1968, denying the plaintiff's request for a preliminary injunction in connection with the lawsuit."

On September 20th, defendant noticed its motion for summary judgment pursuant to Rule 56(b) on the ground that none of the plaintiffs had standing to sue, claiming (1) that ELS itself had not purchased, sold or retained any securities as a result of any representations or admissions of the defendant; (2) that, on deposition taken subsequent to the hearing before Judge McLean, Fitzpatrick testified that he tendered shares of ELS to defendant solely as a result of a request by Burgess, and admitted that in doing so he did not rely in any way upon any statements made in the tender offer; and (3) that Burgess, in tendering 128,000 shares and retaining 1,000 shares on September 11th, did so with full knowledge of all the facts (since his acts were subsequent to the evidentiary hearing before Judge McLean) and without reliance on any of the acts or statements of the defendant.

On October 14th, plaintiffs moved for a preliminary injunction herein, requesting that the defendant be enjoined from

"(a) requiring that a special meeting of the shareholders of Electronic Specialty Co. be held; (b) voting the shares of stock of Electronic Specialty Co. held by defendant at any such meeting; and (c) proceeding any further with an action commenced by the defendant in the Superior Court of the State of California in which the instant defendant seeks to obtain a list of Electronic Specialty Co. shareholders and also seeks to compel the holding of a special meeting of the stockholders of plaintiff Electronic Specialty Co."

Between October 17th and the events listed below, the Superior Court of California granted defendant's application for mandamus under California law and ordered ELS to convene a stockholders' meeting, which is presently scheduled for December 30th.

On November 12th, this court commenced an evidentiary hearing on defendant's motion for summary judgment and plaintiffs' current motion for a preliminary injunction. The hearings lasted eleven days. During the course of the hearings, on November 21st, plaintiffs' motion to amend its complaint was granted. The amended complaint sought new relief: (1) permanently enjoining defendant from voting its ELS stock, and (2) permanently divesting defendant of its common stock and debentures of ELS pursuant to an appropriate order of this court.

On November 27th, defendant served its answer to the amended complaint, adding as a fifth affirmative defense that plaintiffs ELS and Burgess had violated Section 10(b) and Section 14(e) of the Securities Exchange Act of 1934 and Rule 10b–5. Defendant contends that the alleged violations caused plaintiffs ELS and Burgess to be guilty of "unclean hands" such as to bar them from equitable relief.

At the request of the court, the Securities and Exchange Commission has submitted a most helpful brief as to the question, heretofore undetermined, as to the standing of the corporate plaintiff

to sue under the new Sections 14(d) (1) and 14(e) of the Act.

## I.

## THE MOTION FOR SUMMARY JUDGMENT

### A. *The Corporate Plaintiff.*

ICC claims that the corporate plaintiff has no standing to sue because it "has not purchased, sold, or retained any securities as a result of any representations or admissions of the defendant."

 The position is not sound. Aside from the fact the Judge McLean has already in his earlier opinion held, on the authority of Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840 (2d Cir. 1967), that the corporate plaintiff in this case does have standing to sue, the authorities clearly establish that in the factual context of this case the corporation is a proper plaintiff. It is true that, in view of the novelty of the legislation here construed, no authorities have ruled that a corporate plaintiff has standing to sue for an injunction specifically under Section 14(d) (1) and (e). However, prior decisions as to the standing of a corporate plaintiff to sue for an injunction under Section 10(b) and, more particularly, Section 14(a) (proxy regulation) are apposite.

As the Supreme Court said in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 in holding, in a stockholders' derivative suit, that the District Court had jurisdiction to grant relief under Section 14(a) of the Act (at p. 432, 84 S.Ct. at p. 1560):

> "The injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder. The damage suffered results not from the deceit practiced on him alone but rather from the deceit practiced on the stockholders as a group."

By necessity, if a stockholder has standing in a derivative suit to sue for violations of the statute (and, in particular, Section 14(a), which is the section of the Act most nearly analogous to Sections 14(d) (1) and 14(e)), the corporation from which the stockholder derives his rights must also have standing to sue.

In referring to the *Borak* case, the Court of Appeals for this Circuit held in Studebaker Corporation v. Gittlin, 360 F.2d 692 (also a proxy suit), at p. 695:

> "If § 27 of the Securities Exchange Act authorizes a stockholder to assert such a claim on the corporation's behalf, as held in *Borak,* it must also authorize the corporation to do so on its own."

In construing the purpose of Section 14 (a), whose objectives are without question substantially similar to those of Sections 14(d) (1) and 14(e),[5] the Court of Appeals stated (p. 695):

> "But the legislative history shows that Congress anticipated protection

5. In the House Report on the legislation which became Sections 14(d) and (e), the comparability of the proxy and tender offer situations was stressed and the need for similar disclosure in both cases was emphasized. (H.Rep. No. 1711, 90th Cong., 2d Sess. p. 3, (July 12, 1968), U.S.Code Cong. & Admin.News 1968, p. 2998):

> "Where one company seeks control of another by means of a stock-for-stock exchange, the offer must be registered under the Securities Act of 1933. The shareholder gets a prospectus setting forth all material facts about the offer.

He knows who the purchaser is, and what plans have been made for the company. He is thus placed in a position to make an informed decision whether to hold his stock or to exchange it for the stock of the other company.

"Where corporate control is sought through a proxy contest, the Securities Exchange Act requires that shareholders be informed of the identity of the participants and their associates, their shareholdings and when they acquired them. When shares are purchased with borrowed funds, the identity of the lender must be disclosed if the funds

from 'irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials,' S.Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934), quoted in 2 Loss, supra at 950, and the Proxy Rules are shot through with provisions recognizing that in contests for control the management has a role to play as such and not merely insofar as the managers are stockholders."

Nothing could be a more appropriate description of the state of facts that exists in this case.

The appropriateness of analogizing the proxy provisions (Section 14(a)) of the Act with the new tender offer provisions (Sections 14(d) (1) and 14(e)) of the Act is supported by the brief *amicus curiae* of the Securities and Exchange Commission in this case, in which it is observed (commencing at p. 10):

> "The Gittlin holding recognized that the legislative history behind the proxy rules demonstrates an intent to extend their scope of protection to the corporate participants in a contest for control without requiring a showing that any particular transaction was damaging to the corporation. *This same scope of protection appears to be clearly provided by the new tender offer provisions and the same rationale regarding standing should therefore apply to a target corporation like plaintiff ELS."*

Reference to these authorities makes it clear that the corporate plaintiff in this case has standing under the new Sections 14(d) (1) and 14(e). Since the sole relief sought by plaintiffs is an injunction, and since that relief is, by virtue of the provisions of Section 27 of the Act, equally available under Sections 14(d) (1) and 14(e) or Section 10(b), there is no need for us to decide at this time whether the corporate plaintiff also has standing to sue under Section 10(b). It may be observed, however, that rulings and dicta of the Court of Appeals in this Circuit in Symington Wayne Corp. v. Dresser Industries, Inc., supra, and General Time Corp. v. Talley Industries, Inc., et al., 403 F.2d 159, (October 23, 1968), by no means foreclose the possibility that the corporate plaintiff has standing to sue for an injunction under Section 10(b) as well as under Section 14.

In support of its position, defendant relies upon Pacific Ins. Co. v. Blot, 267 F.Supp. 956 (S.D.N.Y.1967), in which, in a 10b–5 action, Judge Herlands held that a target corporation had no standing to sue for an injunction. In *Pacific*, as here, the Securities and Exchange Commission, at the request of the court, submitted a brief *amicus curiae*, to which Judge Herlands referred with approval. The Commission there supported the view that the corporate plaintiff did *not* have standing to sue for an alleged Section 10(b) violation. In sharp contrast, the SEC's brief in this case states (p. 11):

> "We do not believe that the question of standing under the new tender offer provisions is, in any way, related to prior treatment under Section 10 (b) or Rule 10b–5 of the Act. Defendant ICC cites the Commission's *amicus curiae* brief in Pacific Insurance Co. v. Blot, 267 F.Supp. 956 (S.D.N.Y.1967) where we intimated

were obtained otherwise than through a bank loan or margin account. In both the exchange offer and the proxy fight the information is filed with the Securities and Exchange Commission and is subject to statutory requirements and sanctions.

"In contrast when a cash tender offer is made, no information need be filed or disclosed to shareholders. Such an offer can be made on the most minimal disclosure; *yet the investment deci-*

*sion—whether to retain the security or sell it—is in substance little different from the decision made on an original purchase of a security,* or on an offer to exchange one security for another.

*"The cash tender offer is similar to a proxy contest,* and the committee could find no reason to continue the present gap in the Federal securities laws which leaves the cash tender offer exempt from disclosure provisions." (Emphasis added.)

that a target corporation in a tender offer could not maintain an injunctive action under 10b–5 absent a more definite allegation that it was damaged by the tender offer. We consider our views therein to be inapplicable to the present situation. In *Blot* we distinguished the protection afforded by 10b–5 from that by the proxy rules, and Judge Herlands' opinion, supra [267 F.Supp.] 957, also recognized the 'substantive distinction' of the case from one within the rationale of *Borak* and *Gittlin*.

"We believe therefore that the target corporation in a tender offer is within that class of persons that Congress sought to protect in enacting the tender offer amendments to Sections 13 and 14 of the Act. The Commission is responsible for enforcing these laws but, as in proxy contests, we may not be fully informed of the facts which should be publicly disclosed, particularly in view of our limited opportunity to review solicitous material. We believe that private action here is 'a necessary supplement to Commission action,' and the fact that the plaintiff did not tender its shares in reliance upon an alleged violation should be no ground for failure to apply the general rule that persons for whose benefit the statute was enacted may maintain an action for damages caused them by its violation." (Footnotes omitted.) [6]

The court concurs in these views of the Securities and Exchange Commission and, as stated above, holds that ELS has standing under Sections 14(d) (1) and 14(e) of the Act.

B. *Burgess.*

It is not disputed that, except for the fact that Burgess tendered 128,000 of his 129,000 shares, he would have stand-

ing, under the facts alleged here, to sue for an injunction under Sections 14(d) (1) and (e), although a non-tenderer. Even before the enactment of Sections 14(d) (1) and (e), which conferred specific protection on persons to whom a tender offer was addressed, it was held in Moore v. Greatamerica Corp., 274 F. Supp. 490 (N.D.Ohio 1967) (cited with apparent approval in Mutual Shares Corporation v. Genesco, Inc., 384 F.2d 540 (2d Cir.) at 545) that non-tenderers had standing, along with tenderers and the corporate issuer, to sue to enjoin consummation of a tender offer. Further persuasive authority for the validity of this position is found in Dann v. Studebaker-Packard Corp., 288 F.2d 201 (6 Cir. 1961), which sustained the standing to sue of a stockholder to whom a proxy solicitation was addressed, but who had not given his proxy. There the Court of Appeals for the 6th Circuit stated (at p. 209):

"But does a stockholder who has not himself given a proxy pursuant to false and misleading solicitation have standing to assert such a right of action? * * * As we have noted above, the right sought to be protected by federal law is the right to full and fair disclosure in corporate elections. Therefore, it is not important whether or not the complaining stockholders were deceived—they could suffer equally damaging injury to their corporate interests merely because other shareholders were deceived in violation of federal law."

In support of its position, the court quoted from Professor Loss's "excellent article entitled The SEC Proxy Rules in the Courts" (pp. 1058–1059) to the effect that:

"The remedy is based not on any concept of the proxy attorney's vio-

---

6. It should be noted that in one footnote the SEC's brief quotes from the opinion of the Court of Appeals of this Circuit in A. T. Brod & Co. v. Perlow, 375 F.2d 393 (1967) as follows:
"We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connec-

tion with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." (Emphasis added by SEC.)

lation of a fiduciary obligation to his principal, but on the premises that either side in a contested solicitation has a legitimate interest, in view of the statutory purpose, to cry 'foul' against the other."

This view appears in accord with the "trend of recent decisions in the securities area which have favored a broad and liberal interpretation of the Act in order to eliminate any undesirable practices." Moore v. Greatamerica Corp., supra, 274 F.Supp. at p. 492.

■ It is apparent that the new sections of the Act were intended to protect both tenderers and non-tenderers. It is therefore clear that Burgess, except for the tendering by him of 128,000 shares, would fall within the class of persons intended to be protected by the Act.

However, defendant claims that a chemical change occurred in Burgess' standing as a non-tenderer because his non-tendering continued after he became fully aware of the facts as presented in the evidentiary hearing before Judge McLean. The court does not agree. Burgess acquired his 1,000 shares innocently and cannot be deprived of his standing by virtue of the defendant's acts in revealing the facts of its behavior to him during the course of a lawsuit. To hold otherwise would be to leave in the control of violators the right to disqualify non-tendering stockholders from bringing suits against the violators for past deceptions merely by revealing the true facts thereafter. This is especially true where the revelations, as here, were not made voluntarily but in the course of litigation.

■ The court therefore holds that Burgess has not lost his standing to sue under Sections 14(d) (1) and (e). Since, as in the case of the corporate plaintiff, he seeks injunctive relief only, and this is available to him under Section 14, it is unnecessary at this time to rule as to whether or not he also has standing under Section 10(b).

## C. *Fitzpatrick and the Tenderers.*

Plaintiff Fitzpatrick has sued on behalf of himself and others who tendered. However, defendant contends that Fitzpatrick no longer has standing to sue because he testified, in a deposition taken between the time of Judge McLean's opinion and the hearing on these motions, that he tendered solely in response to a request by plaintiff Burgess in order to become a plaintiff in this lawsuit, and not in reliance on ICC's alleged violations.

"Q. Is it a fair and accurate statement to say, Mr. Fitzpatrick, that your tender of those 100 shares was based solely upon the request made to you by Mr. Burgess?

"A. That is correct.

"Q. I take it from your answer that you, in making that tender, did not rely in any way on any statements made in the tender offer.

"A. No.

"Q. You did not?

"A. No, I did not."

Whether or not Fitzpatrick would be disqualified for nonreliance as a plaintiff seeking only injunctive relief as to a consummated violation of the Act need not be decided in this case for the reasons set forth immediately below relating to the class of tenderers as representative of which he sues.

It will be recalled that on September 16th (19 days after this suit was instituted) ICC issued a withdrawal offer to all ELS shareholders who had tendered shares or debentures (except management tenderers). The offer contained the full text of the complaint in this action and of Judge McLean's opinion. The offer not only referred to the complaint and opinion, but urged the stockholders "in this connection to study the complaint and consider the possibility that any or all of the charges made therein might be sustained in a trial of the action." As a result of defendant's withdrawal offer, only about 1,100 shares out of 1,038,946

were withdrawn, clearly indicating that the tendering shareholders preferred to sell their stock to ICC at the tender offer price ($39) than to have it back.

█ In the court's view, defendant's timely offer to the tendering shareholders to rescind the tender transactions at the option of the tenderers has rendered moot the cause of action which the tenderers would otherwise clearly have had under the Act. The withdrawal offer was a complete and candid statement by ICC of the facts as they stood at that date. Shareholders of ELS who had tendered were offered a simple procedure to effect rescission, were extended a reasonable period of time within which to act, and were given complete disclosure of the adverse as well as the favorable facts of the situation.

The original complaint filed herein requested that defendant be enjoined from

"(c) failing to return to the tendering shareholders and debenture holders of ELS all shares of stock and debentures so tendered."

The plaintiffs, in other words, requested that in the case of tenders already made the court should order rescission. Indeed, recission is a most appropriate remedy for the violations charged. By making its withdrawal offer, defendant voluntarily gave to the tendering shareholders the right to rescind, and afforded the relief requested in the complaint. The tenderers were afforded a full opportunity to study the allegations of the complaint and to determine what action they wished to take. They clearly determined, with knowledge, to adhere to the decision to sell their stock, and the claims of the class of tenderers (which includes Fitzpatrick, to whom the withdrawal offer was also addressed) are thereby mooted.

This is not to hold that an offer of rescission will render all claims for violation of the new tender offer provisions moot or protect the violator in any and all circumstances, but merely that, under the special circumstances of this case, including the completeness and candor of disclosure, the tendering stockholders rejected the offer of rescission with knowledge, and have settled or mooted the claims they would otherwise have had.

Defendant contends that plaintiffs have failed to state a claim for relief under the Act. The disposition of the case as to Fitzpatrick makes it unnecessary to rule on the validity of this contention as to him.

█ As to ELS and Burgess, the court finds that they have stated claims for relief under the Act. As indicated above, both the corporation and Burgess are among the classes of persons intended to be protected by the Act; in the complaint they allege violations of the Act and rules sufficient to constitute a cause of action; and, as indicated below in the discussion relating to the motion for temporary injunction, the plaintiffs have established the probability of their proving a violation of the Act for which relief can and should be granted.

## II.

### THE MOTION FOR AN INJUNCTION

Plaintiffs move for a preliminary injunction barring defendant from

"(a) requiring that a special meeting of the shareholders of Electronic Specialty Co. be held;

"(b) voting the shares of stock of Electronic Specialty Co. held by defendant at any such meeting;

"(c) proceeding any further with an action commenced by defendant in the Superior Court of the State of California in which the instant defendant seeks to obtain a list of Electronic Specialty Co. shareholders and also seeks to compel the holding of a special meeting of the stockholders of plaintiff, Electronic Specialty Co." [7]

7. In addition, plaintiff has amended its complaint to request (1) a permanent injunction against ICC's voting its ELS stock and (2) an order that ICC divest itself of its ELS stock.

Some portions of the request for relief are now moot, in view of the fact that since the making of this motion the California Superior Court has in fact ordered that a meeting of stockholders of ELS be held.

The facts developed at a lengthy evidentiary hearing at which all the principals (participating directors and officers of both corporations), as well as their investment banking advisers and others, testified, are as follows:

In early 1968, ICC determined to raise large sums of money for the purpose of acquiring other ·corporations. Its declared objective was to improve the business performance of the acquired companies and, where it appeared appropriate, to consolidate the operations of ICC with the acquired company. Pursuant to this plan, in early 1968 ICC sold $14,000,000 worth of its common stock and debentures to American purchasers, and in the months of June and July, 1968, effected the sale of $25,000,000 worth of Eurobonds.

As early as March of 1968, the officers of ICC, and particularly its president, largest stockholder and dominating force, Robert L. Vesco (and to a lesser extent, its active vice president, Richard Pershing), prepared a list of target companies whose acquisition would be suitable and beneficial from ICC's point of view. Prominent among the listed was ELS.

Apparently assuming that its Eurobond offer would succeed, ICC's vice president, Richard Pershing, met on June 15th with an officer of the Bank of America in Los Angeles to determine whether the Bank of America would extend the necessary credit which, together with ICC's own moneys, would enable it to make a tender offer for the stock of one of the companies on the list of target companies, which included ELS.[8] It is not clear from the evidence whether Pershing at the time told the Bank of America representative that ICC actually owned or controlled 10% of the ELS stock or merely posited that as a condition precedent to the loan which was being discussed. The talks led to further meetings which were ultimately consummated in a large loan by the Bank of America to ICC in connection with the actual tender offer.

In early July, Vesco made preliminary arrangements for a tender offer by causing a dealer-management agreement to be drafted, and discussing with the Bank of America the possibility of its becoming the depositary.

On July 11th, the Eurobond offering was consummated and the full amount became available to ICC. It, of course, then became of immediate importance to ICC to put its large sums of cash to work, since the interest alone on its outstanding indebtedness exceeded (and may still exceed) its net earnings of the prior year. Consequently, on July 12th the ICC Board of Directors met to review the program for acquisitions. ICC's officers had marked as its first and most desirable target "Company B". Between July 12th and July 22nd discussions took place with the officers of Company B as to a possible consolidation. It became quickly apparent, however, that the marriage was foredoomed, since, according to Vesco, serious antitrust problems arose which precluded ICC's affiliation with Company B.

Under the compulsion of investing its money forthwith, ICC immediately turned to ELS, which had always been high on the list of possible targets. Vesco took steps through large investors in ELS to arrange an immediate meeting with Burgess. The meeting was to take place on July 26th. In preparation for the meeting, on July 23rd Vesco placed an order with Butler's Bank in Nassau (at which defendant had large sums on deposit) to purchase up to 100,000 shares of ELS stock. It is undisputed that the purpose of purchasing the stock was to

8. Although Pershing referred to the Company only as "Company A" (a designation used by ICC in its internal and external discussions prior to actual negotiations with ELS), it is agreed that Company A was in fact ELS.

put ICC in a strong bargaining position vis-a-vis ELS in the coming negotiations. In fact, only 43,500 shares of ELS were purchased by Butler for ICC and thereafter, and before the July 26th meeting, Vesco cancelled the outstanding order. His explanation for the cancellation was that he did not want to be in the position of purchasing ELS shares at the very time that he was meeting and negotiating with Burgess.

On the morning of July 26, 1968, Vesco, Pershing, Dugan (of Smith, Barney, ICC's investment advisers), Harmon (president of ELS) and Burgess met. Vesco made immediate suggestions as to a merger of ICC and ELS. Most of the day was apparently devoted to familiarizing ELS with ICC's operations and potential. Vesco informed Burgess that ICC owned ELS stock, but admittedly did not reveal the amount. Although it is not clear whether Vesco intimated to Burgess on July 26th that ICC owned 100,000 or more shares of ELS, it is certain that he vigorously fostered this impression during the discussions which took place in succeeding days. Indeed, the certainty of Vesco's intention to mislead on this point is confirmed by his testimony before the SEC in its informal investigation of ICC's tender offer herein.[9] When questioned as to the answer which he gave to Burgess' inquiries as to how much ELS stock ICC actually held, Vesco explained:

> "These are negotiating tactics and we did not say anything untrue, but we did not answer the question either."

Vesco admitted in his SEC testimony that he deliberately misled Burgess as a negotiating tactic by, for example, hinting that ICC was subject to the provisions of the Act which required SEC filing by an owner of more than 10% of the stock of covered companies. In fact, of course, ICC held only about 2½% of ELS' stock.

July 26th was a Friday. Vesco's impetuous desire to consummate a merger or a consolidation with ELS is typified by his suggestion that negotiations continue during the weekend and that, indeed, ELS should summon its investment bankers, Hornblower, Weeks, Hemphill & Noyes, from New York to California to join in immediate discussions. It is hardly surprising that this proposed arrangement was not feasible, but Burgess did nevertheless respond by arranging for a meeting in New York on Monday, July 29th, between representatives of Smith, Barney, acting in behalf of ICC, and of Hornblower, Weeks in behalf of ELS. At the meeting Smith, Barney proposed that negotiations for a merger be approached on the basis that ELS would acquire ICC and would issue to ICC's stockholders one share of ELS for each share so acquired.

On July 31, 1968, the Wall Street Journal in its widely read column "Heard on the Street" reported that ELS stock had jumped and stated that:

> "Wall Streeters attribute much of the stock's sharp rise to rumors of a possible take-over attempt"

by ICC. The article continued:

> "According to brokerage house reports, International Controls, whose 1967 volume was less than a tenth of Electronic Specialty's $100 million-plus volume last year, has already taken a stock position in the concern. This position was said to be about 5% of Electronic Specialty's roughly 2 million shares outstanding."

This statement was, of course, untrue, since at the time ICC owned only 43,500 shares of ELS and never owned more prior to the tender offer.

Vesco, who was referred to in the article, knew of the article but failed to take any steps to correct the record. While he did call Burgess for the purpose of discussing with him their common interest in allaying the rumors of take-over, nevertheless, apparently as part of his "negotiating tactics", he allowed Burgess to believe that the statement that ICC own-

---

9. The hearings referred to were held August 22nd and 23rd in Washington.

ed 5% of ELS stock (or approximately 100,000 shares) was true.

On August 2nd, ELS' stock reached 42⅞, which was an all-time high. On that day, Smith, Barney advised Vesco that ICC should not proceed with the tender offer since the venture had become too expensive as a result of the increase in the price of ELS stock.

On August 3rd, Burgess (and ELS' counsel Beek) met with Vesco in New York. Burgess made it clear that ELS was not favorably inclined toward a tender offer and that indeed ELS intended to proceed with long negotiated plans for a merger with another company (later revealed as Carpenter Steel). Apparently on the basis of the Smith, Barney advice of August 2nd, and Burgess' negative response of August 3rd, Vesco momentarily receded in his drive to acquire control of ELS and informally agreed with Burgess that ELS would purchase ICC's shares of ELS stock (up to a maximum of 50,000) at 42 a share.[10] Nevertheless, on August 3rd ICC was continuing its arrangements relating to a tender offer for ELS shares, and a draft of a tender offer of that date for 1,000,000 shares is in evidence.[11]

On Monday, August 5th, ICC issued a statement over the Dow-Jones "Broad Tape" as follows:

"FAIRFIELD N J–DJ–ROBERT L VESCO PRESIDENT OF INTERNATIONAL CONTROLS CORP SAID THAT EXPLORATORY MERGER DISCUSSIONS HELD WITH ELECTRONICS SPECIALTY CO HAVE BEEN TERMINATED

"MR VESCO SAID THE DISCUSSIONS WERE BROKEN OFF BY INTERNATIONAL CONTROLS—

"INTERNATIONAL CONTROLS— WHICH RECENTLY OBTAINED 40 MILLION DLS FROM PUBLIC AND PRIVATE PLACEMENTS OF ITS SECURITIES BOTH IN THE U S AND ABROAD—HAS SAID IT HAS NO PRESENT PLANS TO USE THOSE FUNDS FOR A TENDER OFFER AS HAD BEEN RECENTLY RUMORED

"MR VESCO STATED HOWEVER THAT INTERNATIONAL CONTROLS CORP WOULD CONTINUE TO EXPLORE MERGER AND ACQUISITION POSSIBILITIES WITH OTHER COMPANIES"

In spite of Vesco's statement of August 5th that merger discussions with ELS had been "terminated" and "broken off by International Controls", and particularly that ICC "has no present plans to use [its] funds for a tender offer as had been recently rumored," nevertheless, according to the testimony of Morgan, of Smith, Barney, on the very next day, August 6th, Mr. Vesco discussed with him not only the making of a tender, but the proposed price, the number of shares, and the dealer-manager fee, agreeing that a tender offer should be given consideration. Vesco admits this conversation.

On August 6th, Vesco also placed a day order through Orvis Brothers for the sale of 10,000 shares of its ELS stock at a price no less that 35. This order was placed at the very end of the trading day and was carried out after 3 o'clock to the extent that 5,400 shares were actually sold. The order was never reinstated because Smith, Barney and ICC's attorneys, on learning of the sale, advised Vesco that sales of ELS stock might be considered as a culpable manipulation of the market if ICC intended thereafter to tender.

Morgan, of Smith, Barney, further testified that around August 8th he and Vesco again discussed the tender offer

---

10. As a result of various misunderstandings which each of the companies blames on the other, this agreement was never carried out.

11. Burgess and Vesco had agreed that ELS would announce its proposed merger plans (with Carpenter) and ICC its decision not to tender for ELS on the morning of August 5th. The texts of the announcements were not cleared with each other.

by telephone. Smith, Barney was at that time recommending to Vesco that if a tender offer were made it should, in the light of ICC's August 6th sale of 5,400 shares of ELS stock, be postponed to allow the market to seek its own level.

On August 13th, Vesco was again interviewed by the Wall Street Journal's writer for "Heard on the Street." The interview was published on August 15th and included the following statement:

"Asked about International Controls' position on Electronic Specialty, which turned down a merger bid from International and agreed instead to a merger with Carpenter Steel, Mr. Vesco said: 'Our preference is to sell our stock in Electronic Speciality (close to 5% of Electronic's two million shares) but there is no urgency to do this. We will continue to watch the progress of the proposed merger with Carpenter and may, at some point, seek to resume talks with Electronic Specialty."

The very night of the interview (August 13) ICC's Board of Directors met and, according to its minutes, Vesco recommended to the Board that a tender offer should be reconsidered and that ICC stood an excellent chance of successfully tendering for 25% of ELS' stock. The Board did not turn a deaf ear but advised Vesco to wait a week and to consult with Smith, Barney in the interim.

On August 16th, after extensive discussions with ICC, Smith, Barney declined to act as dealer-manager for the ELS tender offer and Mr. Dugan testified that their reason was "general doubts in our minds as to the possible implications of the reading of The Wall Street Journal which appeared on August 15th * * *" Disregarding these views and Smith, Barney's repeated advice against a hostile tender offer, Vesco proceeded to arrange that day for another brokerage firm, of which he was a limited partner, to act as dealer-manager of the tender offer.

Also on August 16th, ICC filed with the Securities and Exchange Commission Schedule 13–D required of tender offerors by Section 14(d) (1) of the Act.

On August 17th, Vesco swung ICC's Board of Directors over. At its meeting on that day it adopted resolutions approving a dealer-management agreement, the agreement with the despositary, and the form of tender. According to the testimony of an ICC director, previously an attorney for the company and a man well versed in securities law, he and other directors changed their position because the market had indicated that ELS stockholders were not favorable to the Carpenter Steel merger proposal, and the proposed repurchase of ELS stock by ELS from ICC had clearly fallen through.

On August 19th, the tender offer was published in New York, Los Angeles and San Francisco.

■■ The actions of ICC described above violate the proscription of Rule 10b–5(3) against engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." ICC's course of conduct also violates Section 14(e) of the Act, which, as Judge McLean observed in his opinion, "in substance makes the provisions of Section 10(b) and Rule 10b–5 applicable to tender offers", and particularly that portion of Section 14(e) which proscribes engaging "in any fraudulent, deceptive or manipulative acts or practices in connection with any tender offer." Although no rule equivalent to Rule 10b–5 has yet been promulgated by the Securities and Exchange Commission in relation to Section 14(e), nevertheless the similarities of language and purpose between Sections 10(b) and 14(e) are such as to suggest that the standards of Rule 10b–5 are appropriate standards for the interpretation of the portion of Section 14(e) relevant in this case.

The violations consist both of deliberately misleading and deliberately allowing others to mislead.

(1) ICC misled both ELS and the public as to its actual intention to make a tender offer. With a rare and momentary lapse only, it is clear that from mid-July on it was ICC's unswerving intention, carried out by its chief executive officer and dominating personality, Vesco, to acquire control of ELS by one means or another, and by a hostile tender offer if nothing else would work. Even on the occasion of the one momentary lapse, when Vesco placed a day order for sale of 10,000 shares of ICC's ELS stock, the order was not pursued thereafter because he was advised that any sale might prejudice a later tender offer. Clearly, therefore, the intention to tender was the controlling element. Further, it must be remembered that ICC was under a compelling necessity to invest its funds, and the record is barren of evidence as to any other vehicle for such investment. In spite of this unswerving intention, ICC, through Vesco, made misleading statements on several key occasions, in private discussions with ELS and in public releases, claiming that it had no intention of proceeding to a tender offer, when it in fact did.

(2) ICC made misleading statements as to its intention to sell or not sell its ELS holdings.

(3) ICC at the very least allowed the financial media to publish and republish what it knew to be a false statement as to the actual number of shares which it held in ELS.

Even if it is true, as Vesco testified, that he did not advise the Wall Street Journal[12] that ICC owned 5% of ELS' stock (as published in the Journal July 31st and August 15th), he knew of these false statements, he was keenly aware of their importance and of the fact that they had been published more than once at critical times, and he was aware of their potential influence on the market.

Defendant contends that, even if ICC's conduct violated the statute, it had no effect on trading in ELS stock. While it may be impossible, because of the numerous forces affecting securities trading, to trace a causal relationship, it appears unnecessary to do so if the view stated above that the standards established by Rule 10b–5 (for interpretation of Section 10(b)) are appropriate measurements for interpretation of the antifraud provisions of Section 14(e). Rule 10b–5 (subsection (3)) does not require that the fraudulent act come to fruition, but merely that the "practice, or course of business * * * would operate as a fraud or deceit upon any person." Here the misleading and deceptive statements, in preparation of the tender offer, clearly "would operate as a fraud or deceit."

ICC's course of conduct does not measure up to the standards of Section 10(b) (or, by adoption, Section 14(e)). The observations of the Court of Appeals of this Circuit in Securities and Exchange Commission v. Texas Gulf Sulphur Co., et al., 401 F.2d 833 (Aug. 13, 1968) are apposite. In holding, in that case, that a corporate defendant was liable under Section 10(b) and Rule 10b–5 for the issuance of a misleading press release (whether issued negligently or deliberately), the court (401 F.2d p. 859) approved a reference to Section 10(b) which described it as providing that:

> " 'Thou shalt not devise any other cunning devices.' "

Expanding on the meaning of Section 10(b), the court stated (401 F.2d at p. 861):

> "More important, however, is the realization which we must again underscore at the risk of repetition, that the investing public is hurt by exposure to false or deceptive statements irrespective of the purpose underlying their issuance. * * * Ac-

12. Vesco admitted in substance that he told the Wall Street Journal on August 13th that ICC preferred to sell its ELS stock even though that night he and his Board met to have another go at the tender offer.

cordingly we hold that Rule 10b–5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public, e. g., by means of the financial media, Fleischer, supra, 51 Va.L.Rev. at 1294–95, if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes."

If it is true that misleading statements are culpable regardless of whether issued for ulterior purposes, then certainly such statements are culpable when actually issued for ulterior purposes.

■ Furthermore, it abides by this standard to require that statements known by a corporate official to have been publicly attributed to him in the financial media (even if not actually made by him) should be corrected if, as here, they are material, are repeated on more than one occasion, occur during a critical period, and are clearly understood by the corporate official to have potential influence on the market.

Vesco's conduct in deliberately looking the other way as to the Wall Street Journal's misstatements relating to the amount of ELS stock owned by ICC is a parallel of his admitted "negotiating tactics" in his dealings with Burgess.

These views are consistent with Judge Cooper's holding in Securities and Exchange Commission v. Shattuck Denn Mining Corp., 297 F.Supp. 470 (S.D.N.Y. 1968), in which Judge Cooper held that the failure of a corporate officer to correct public statements which, although true when made, became untrue thereafter, constituted a violation of Rule 10b–5.

Thus far we have dealt with acts constituting violations of Section 10(b) or Section 14(e) of the Act. We now turn our attention to statements of the defendant which plaintiffs allege constitute violations of Section 14(d) (1) of the Act. These statements were included in the tender offer as advertised and the Schedule 13–D filed by defendant with the SEC in accordance with the requirements of the Act. The alleged misstatements, not already disposed of in the opinion of Judge McLean, consisted of the following:

1. Plaintiff claims that when the tender offer was published defendant had a fixed and definite plan to merge ELS and ICC on a so-called "share-for-share" basis which it failed to disclose. Schedule 13–D required that the tender offeror state "plans or proposals which such person may have to liquidate such issuer, to sell its assets to or merge with any other persons or to make any other major change in its business or corporate structure."

■ It is true that if defendant unconditionally intended on August 19th to merge the two corporations after it acquired control of ELS, it was obligated to reveal this intention in the filed and published material. However, plaintiffs have not established the probability of proving at trial that defendant harbored such an intention. Testimony of defendant's investment bankers, Smith, Barney, shows that merger on a share-for-share basis was proposed as a basis for negotiation. While ELS undoubtedly had no duty to counter ICC's proposals with counterproposals (as ICC implies in its pre-trial memorandum), there is nevertheless little evidence that ICC was adamant or had a fixed and unshakable determination to merge the companies on a share-for-share basis.

In its published tender offer of August 19th, ICC stated:

"The Company [ICC] intends through this Offer to acquire control of Specialty. It does not presently have any plans or proposals to liquidate Specialty, to sell its assets or merge it with any persons (other than the Company or its subsidiaries), or to make any other change in its business or corporate structure, except that it intends to continue Specialty's stated plans to sell its Space Condi-

tioning Division and will consider the possible liquidation or sale of any other unprofitable divisions. Upon completion of this Offer the Company will give consideration to a merger between itself or a subsidiary and Specialty."

While it is quite possible that on August 19th ICC may have intended an ultimate merger with ELS, the court does not find that as of that date it intended to merge on a share-for-share basis, as alleged by plaintiffs. In any event, it is important to note that on August 26th, after conference with the Securities and Exchange Commission, ICC published an amended tender offer in which it specified that the merger to be considered, if it occurred, would be based on "the relative market prices of the common stock of the respective companies during the respective period." The court finds that, even if the language contained in the original tender offer was not accurate, the language contained in the amended offer did comply with the requirements of the statute. Since only 1,686 shares of the 1,038,946 shares ultimately acquired through the tender offer were tendered before August 26, 1968, the court finds that in no event could there have been a violation as to the 1,037,260 shares purchased after August 26th.

2. Plaintiffs claim that defendant's answer to Item 6 of Schedule 13–D was false in saying that:

"The Company does not have any contracts, arrangements or understandings with any person with respect to any securities of Specialty except as set forth herein."

On this point again the plaintiffs have failed to show the probability of prevailing at trial. It is clear that, as a result of sale of its own stock and debentures, and of its arrangement for a line of credit with the Bank of America, ICC had sufficient funds to complete its tender offer without the aid or counsel of any confederates, and that it in fact had none in the execution of the tender offer. References to "European funds" and stock "in friendly hands", which led ELS to believe that ICC had put together a syndicate to take over ELS, proved upon hearing to be chimeras. Nor did the assurances, if made, of various brokers controlling blocks of ELS stock for their own account or the account of customers that they would tender if ICC were to make a tender offer constitute a "contract, arrangement or understanding" within the meaning of Schedule 13–D. In the first place, such statements were completely unsolicited by ICC. Further, while it is uncertain whether concrete understandings with a future tenderer are required to be disclosed in Schedule 13–D, this question need not be raised since the evidence showed that the point of concrete understandings was never reached.

3. Plaintiffs claim that defendant's answer to Item 3 of Schedule 13–D (source and amount of funds) was false in failing to state that ICC intended to use ELS's cash reserves either to repay, after merger of the companies, ICC's indebtedness to the Bank of America incurred in connection with the tender offer or to use ELS's credit for the same purpose. Here, again, the plaintiffs have failed to show the probability of prevailing at trial. There is no evidence that at the time of filing with the SEC and advertising the tender offer ICC planned to use ELS's cash to repay the Bank of America loan. Certainly if ICC does merge with ELS, or operates ELS as a subsidiary, ICC inevitably will have the benefit of increased borrowing power to the extent of ELS's cash and credit. This was implicit in the tender offer itself. But mere supposition as to ICC's future financing plans does not sustain plaintiffs' burden of proof on this motion.

In any event, plaintiffs must fail as to the particular contention in question, since it is clear that the purpose of the requirement that a tender offeror specify the "source and amount of funds—to be used in making the

purchase" is to give the tenderer facts necessary to make a judgment as to whether he will in fact be paid. Here, of course, all tenderers have been paid. Beyond this, nothing in the legislative history of the new statute indicates an intention to require a tender offeror not only to state the source of his funds, but also, if those funds derive in part from loans, to state the terms upon which the loans are to be repaid.

## III.

## THE DEFENSE OF UNCLEAN HANDS

 The defendant has asserted that plaintiffs are not entitled to equitable relief because of acts on the part of plaintiffs ELS and Burgess amounting to unclean hands. Specifically, defendant contends that the ELS management deliberately refrained from issuing customary monthly financial reports commencing in July 1968, and that its reports for the first six and nine months of 1968, respectively, were deliberately filed late and did not reflect accurately the facts relating to the company's earnings. After careful review of the evidence on this point, the court believes that these acts of ELS' management were taken in good faith. In particular, it is the court's view that the reason for discontinuance of monthly statements in July 1968 was that such statements had previously been issued primarily for the benefit of a bank lender whose loan was about to mature as a result of the sale, since consummated, of a substantial company property; that the postponement of the issuance of the six and nine months reports was validly based on the pendency of the sale of this major company asset, which had a substantial effect on the company's financial condition; and that the record and projections of earnings set forth in such statements were in good faith believed to be true at the time they were made.

 Defendant has also pressed certain secondary contentions of unclean hands, claiming that ELS' management, including Burgess, (1) in bad faith changed its recommendation to ELS stockholders not to tender their stock, and (2) pretended to negotiate as to possible merger with ICC while it actually intended to merge with Carpenter Steel. Defendant has not sustained its burden of proof on these points.

 The court holds that management's change of position with regard to tender, while regrettably late, was in good faith, and was naturally impelled not only by the knowledge that ICC would achieve working control of ELS, but equally importantly, by the fact that ICC itself at the last moment opened the tender offer on an unlimited basis.

The court also believes that Burgess, on behalf of ELS, did negotiate with ICC in good faith, but never received from ICC even a part of the factual material which a business executive would require in order to make an intelligent decision as to the merits of such a major and complicated proposal.

Since the court finds that neither Burgess nor ELS was guilty of unclean hands, it is unnecessary to determine whether, as plaintiffs contend, the defense is unavailable in a class action such as this.

## IV.

## REMEDIES

There remains the far from simple question of what remedy is appropriate in the circumstances.

Plaintiffs' amended complaint requests the court to enjoin ICC permanently from voting its holdings of ELS stock and to order ICC to divest itself of that stock. The court believes the requested relief is impractical, inappropriate and punitive in nature. So far as is known, no court has ever utilized its powers under the Securities Act to cause the divestiture of stock obtained in violation of the Act. The only authorities offered in support of their position as to divestiture by plaintiffs

are antitrust cases, such as Hamilton Watch Co. v. Benrus Watch Co., 114 F.Supp. 307 (D.Conn.1953), affd. 206 F.2d 738 (2d Cir. 1953), and American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387 (S.D.N.Y. 1957) affd. 259 F.2d 524 (2d Cir. 1957).

The court is not persuaded that the reasons of public policy which render divestiture an appropriate remedy in antitrust cases are applicable in cases arising under the Securities Act. Where a company acquires stock in a competitor in violation of the antitrust laws, that fact gives rise to a continuing violation. The mere fact of such ownership is in itself a violation. Divestiture constitutes the most effective remedy for such a continuing violation. That state of facts does not exist here. Furthermore, analysis demonstrates that a decree of divestiture would benefit none of the parties except that it might maintain plaintiff Burgess in office. It is not the purpose of the Act or the role of this court to frame a decree to that end.

■ A decree of divestiture (1) would not affect those who have tendered their ELS securities; (2) would not benefit those who have not tendered their securities and, indeed, would injure them by glutting the market with 55% of the stock of ELS. As to ICC and its stockholders, they would of course not be benefited but, on the contrary, might suffer irreparable injury. This is a factor which it is appropriate for the courts to take into consideration. See Green v. Wolf Corp., 406 F.2d 291 (2d Cir.) (Dec. 9, 1968) at p. 303, where Judge Kaufman states:

"The purpose of retribution would not be served by imposing punitive damages for violations of 10b–5 at least as against a publicly held corporation, such as Wolf, because the

heavy burden would ultimately fall on all stockholders, including mere innocent pawns."

■ Since divestiture is an inappropriate remedy, it follows that permanently enjoining ICC from voting its ELS stock would also be inappropriate. Aside from the fact that such an injunction would constitute a partial divestiture without compensation, and apart from the fact that such an injunction would be, so far as the court knows, unprecedented in securities cases, it is hard to envisage how the affairs of ELS itself would be carried on if 55% of its shares could not be voted.

If no permanent injunction against voting is to be granted, it would be a futility to issue a preliminary injunction for the same relief if the solution to the problem can be found in other ways.

While a decree ordering ICC to offer rescission would have cured the problem at least as to those who have tendered, that relief is no longer meaningful in view of our holding that defendant's withdrawal offer to the tenderers has already afforded the equivalent of a rescission.

It becomes necessary, therefore, to explore the remaining remedial possibilities. These are to be measured by the objectives which the court seeks. They are:

(1) To assure that, in the event ICC takes control of ELS, this suit will be continued without jeopardy to plaintiffs ELS and Burgess and the class that Burgess represents.[13]

■ This can and will be accomplished by suitable injunctive provisions requiring the continuance of the suit under the management of present counsel for plaintiffs, regardless of who exercises operating control of ELS, and

---

13. Vesco was quoted in The Oregonian (Portland, Ore.) of October 9, 1968, as indicating "his belief [that] the litigation will be short-lived once the new directors take over ELS." This position has not been denied at the hearing or otherwise. There is no doubt that if ICC exercises control of ELS and is not enjoined, it will discontinue the corporate suit.

granting such other protection as plaintiffs require for this purpose.

(2) To assure that ICC's violations of the Act will not recur.

██ This can and will be accomplished by a decree appropriately enjoining ICC from further violations of the Act in connection with the acquisition of ELS securities. In the light of the testimony at the hearing, such an injunction may be of more than academic importance.

## V.

## PROBLEMS RELATING TO THE CLASS ACTION

This suit has been brought as a class action by Burgess and Fitzpatrick. While it has been ruled that Fitzpatrick and the other tenderers have mooted their claims, it remains necessary for the court, under Rule 23(c) F.R.Civ.P., to determine by order whether the action is to be maintained as a class action.

██ The court holds that Burgess' action has properly been brought as a class action. Defendant contends that Burgess is not an appropriate representative of the class of non-tenderers he purports to represent because he "non-tendered" with knowledge of the facts of this case. It has already been determined, on earlier consideration of this point, that Burgess retains his standing to sue. Burgess' claims are typical of the class of non-tenderers. The other non-tenderers presumably would allege that defendant's acts "in connection with any tender offer" violated Section 14 of the Act. This is precisely what Burgess claims. But, says defendant, Burgess will not fairly and adequately protect the interests of the class because he has a vested interest in retaining his position as chairman of ELS. To the extent that Burgess' managerial position is relevant, the court believes that, on the contrary, his clear interest in remaining at the helm of ELS, far from being antagonistic to the interests of non-tenderers in this suit, would render him an especially vigorous pro-

tagonist. He has retained competent counsel, clearly qualified to serve the interests of all non-tenderers. Even the defendant does not question the fact that Burgess has prosecuted and will continue to prosecute the suit diligently. Further, although the court does not contemplate any conflict of interest arising between Burgess and the other non-tenderers, should such a conflict arise the flexibility of arrangements available to the court under Section 23(c) (4) (B) can be brought into play to set up subclasses or make other appropriate arrangements. See Green v. Wolf Corp., supra; Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966); Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); and Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968).

Finally, under the standards set forth by the Court of Appeals for this Circuit in its very recent pronouncement on the applicability of Rule 23 in Securities Act violations (Green v. Wolf Corp. supra) (Dec. 9, 1968), the court is convinced that the questions of law or fact common to the members of the non-tendering class predominate over any questions affecting only individual members (see also Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42, 45 (S.D.N.Y.1966); Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 914 (9th Cir. 1964)), and that a class action is superior to other available methods for the fair and efficient adjudication of a controversy.

The order implementing this opinion should include appropriate provisions for the implementation of the requirements of Rule 23, including early notification to members of the class.

The parties have indicated to the court the probability of an immediate appeal from this opinion in the hope that the Court of Appeals can express its views prior to the holding of ELS' stockholders meeting scheduled for December 30th. In the event that either of the parties does appeal forthwith from this decision and the Court of Appeals is unable to hear and determine the matter ap-

propriately in advance of December 30th, this court will entertain an application for a reasonable adjournment of the stockholders' meeting.

The court wishes to express its appreciation to the Securities and Exchange Commission, its general counsel and his staff, for furnishing, at the court's request, its helpful brief *amicus curiae*.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

The motion for summary judgment is denied except as to plaintiff Fitzpatrick. The motion for a preliminary injunction is denied as to the relief requested, but is granted as to the relief described hereinabove.

Settle order on two days' notice.