**ELECTRONIC SPECIALTY CO., William H. Burgess and John B. Fitzpatrick, Plaintiffs,**

v.

**INTERNATIONAL CONTROLS CORP., Defendant.**

No. 68 Civ. 3434.

United States District Court
S. D. New York.
Sept. 11, 1968.

See also 2 Cir., 409 F.2d 937.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiffs, Milton Kunen, Jay G. Strum, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant, David R. Hyde, New York City, and Hogan & Hartson, Washington, D. C., of counsel.

## OPINION

McLEAN, District Judge.

This is an action to enjoin defendant from carrying out a tender offer which it made on August 19, 1968 to purchase 500,000 shares of the common stock of

plaintiff Electronic Specialty Co. (ELS) at a price of $39 per share. The offer was to expire on September 3, 1968, but has been twice extended, first to September 9 and then to September 12. By now at least 500,000 shares have been tendered.

Plaintiffs are ELS itself and two of its stockholders, one of whom tendered his stock to defendant and the other of whom did not. Each purports to sue on behalf of all stockholders in his respective class.

Plaintiffs claim that in making the tender offer, defendant has violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), Rule 10b–5 thereunder, and also the new Section 14(e) of the Act (37 U.S.L.Week. 9 (1968)), which became effective on July 29, 1968 and which in substance makes the provisions of Section 10(b) and Rule 10b–5 applicable to tender offers.

Plaintiffs have moved for a preliminary injunction. The court held an evidentiary hearing at which plaintiffs called as witnesses Burgess, ELS's president; Beek, its attorney; and Heller, its investment banker. Defendant's president, Vesco, also testified, first as a witness called by plaintiffs, and later called by defendant. The testimony related primarily to the negotiations between the parties between July 26, 1968 and the making of the tender offer on August 19. Although the testimony is conflicting as to some details, the general course of these dealings is not disputed. The facts are as follows.

ELS is an established company with its principal place of business in Los Angeles, California. It manufactures electronic and aerospace components and systems. Its net earnings in 1967 were approximately $2,630,000, amounting to $1.42 per share.

The common stock of ELS is listed on the New York Stock Exchange. There are approximately 2,000,000 shares outstanding. Plaintiff Burgess, who was one of the founders of the company and is now its president, owns approximately 125,000 shares.

Defendant International Controls Corp. (ICC) is a much newer and smaller company. It was formed in 1966 by the merger of two small companies. Since then, it has acquired several other small companies. It manufactures parts for computers and aircraft, valves, controls, etc., and it also operates certain airports which provide charter plane service. Its earnings in 1967 were approximately $678,000, constituting 31 cents per share.

Defendant's office is in Fairfield, New Jersey. Its stock is listed on the American Stock Exchange. Vesco, its president, owns approximately 900,000 shares, constituting approximately 25 per cent of the total stock outstanding.

In early 1968 defendant raised some $40,000,000 by selling stock and by selling bonds of a wholly owned subsidiary incorporated in the Dutch Antilles. The bonds were sold outside the United States.

Having acquired this substantial amount of cash, ICC determined to employ much of it in acquiring other companies. It selected ELS as one of its first targets.

In July 1968, Vesco made preliminary arrangements for a tender offer, *i. e.*, he caused a dealer-manager agreement to be drafted and he talked to the Bank of America about becoming a depositary. These arrangements were still incomplete when, on July 26, 1968, he opened his campaign by meeting with Burgess in Los Angeles. The meeting was arranged by an intermediary who told Burgess that if he refused to meet Vesco, Burgess would soon read some adverse news.

At this meeting Vesco suggested an immediate merger between ICC and ELS on a share for share basis. He asked Burgess to request ELS's investment bankers in New York to fly to California at once for an immediate discussion over the weekend with ICC's investment bankers, one of whom, a representative

of Smith, Barney & Co., was present at the meeting. As an alternative to a merger, Vesco expressed a willingness to buy Burgess' own stock in ELS at the market price which on that day was approximately $39.

Burgess was unwilling to sell his own stock and he declined to ask his investment bankers to come to California at once. He did express willingness, however, to have them meet during the following week with Smith, Barney in New York.

On July 31, 1968, an article appeared in the Wall Street Journal. It reported rumors of a "take-over-attempt" by ICC against ELS. The article stated that ICC's "position" in ELS's stock was "said to be about 5% of Electronic Specialty's roughly 2 million shares outstanding," (*i. e.*, 100,000 shares). This statement was untrue. According to the evidence, between July 23 and July 25, 1968, ICC purchased in the market 43,-500 shares of ELS. It sold 5,400 on August 6, leaving it with 38,100 which is all the ELS stock it owned during the period relevant here.

Vesco knew that this report was untrue. Nevertheless, he telephoned Burgess and called Burgess' attention to the article. He did not tell Burgess that it was inaccurate. Allegedly on the advice of his counsel, Vesco made no attempt to correct the misstatement in the article.

It is fair to say on the evidence that throughout his negotiations with Burgess, Vesco intentionally gave Burgess a false impression of the magnitude of ICC's holdings in ELS stock. He implied, without literally saying so in so many words, that ICC owned over 100,-000 shares.

On August 1 the board of directors of ICC met to discuss the negotiations with ELS. According to the unsigned draft of the minutes of this meeting, which Vesco testified is accurate, one director expressed concern that a tender offer by ICC against the wishes of ELS's management would "tarnish the image" of ICC. The directors adopted a resolution authorizing Vesco to continue to negotiate with ELS for a merger of the two companies or, in the alternative, to make a tender offer, provided, however, that ELS's management did not oppose such an offer. If neither a merger nor an unopposed tender offer could be arranged, then Vesco was to do his best to sell ICC's holdings of ELS stock.

ICC's investment advisor, Smith, Barney & Co., was also opposed to making a tender offer without the acquiescence of ELS's management. Vesco testified that Smith, Barney strongly advised him against doing so.

Conferences between the investment bankers of the respective companies continued in New York throughout the week of July 29–August 3. It is unncessary to recount them in detail. Suffice to say that ELS's representatives insisted on obtaining data on ICC's sales and earnings, and that information satisfactory to them on this subject was not forthcoming.

On Saturday, August 3, Burgess informed Vesco that ELS was not interested in merging with ICC but that, on the contrary, ELS proposed to merge with Carpenter Steel Company, with whom ELS had been conducting merger negotiations over a period of some months. Vesco then suggested that ELS buy ICC's holdings of ELS stock. He was vague as to the amount of those holdings. He said that they might consist of as much as 116,000 shares, but he was not sure. He also said that if ELS did not agree to buy this stock at once, ICC would make a tender offer on Monday, August 5.

After brief consideration, ELS agreed to buy ICC's holdings up to 50,000 shares at a price of $42 per share, which had been the closing price on the previous day, August 2. Vesco gave Burgess to understand that this figure represented ICC's approximate cost of its shares, including brokerage commissions and certain other expenses. Late on the night of August 3, ELS's counsel, Beek, telephoned Vesco from California and read to him a proposed telegram to that

effect. The telegram further provided that ICC would not make a tender offer for ELS stock for at least six months. Vesco orally agreed to this arrangement. Beek thereupon sent the telegram.

On Monday, August 5, ICC issued a statement which was carried on the Dow Jones ticker. It read as follows:

"FAIRFIELD N J -DJ- ROBERT L. VESCO PRESIDENT OF INTERNATIONAL CONTROLS CORP SAID THAT EXPLORATORY MERGER DISCUSSIONS HELD WITH ELECTRONICS SPECIALTY CO HAVE BEEN TERMINATED

MR VESCO SAID THE DISCUSSIONS WERE BROKEN OFF BY INTERNATIONAL CONTROLS—

INTERNATIONAL CONTROLS— WHICH RECENTLY OBTAINED 40 MILLION DLS FROM PUBLIC AND PRIVATE PLACEMENTS OF ITS SECURITIES BOTH IN THE U S AND ABROAD—HAS SAID IT HAS NO PRESENT PLANS TO USE THOSE FUNDS FOR A TENDER OFFER AS HAD BEEN RECENTLY RUMORED

MR VESCO STATED HOWEVER THAT INTERNATIONAL CONTROLS CORP WOULD CONTINUE TO EXPLORE MERGER AND ACQUISITION POSSIBILITIES WITH OTHER COMPANIES"

On the same day, the ticker carried an announcement of the proposed ELS-Carpenter merger.

The sale by ICC to ELS of ICC's holdings of ELS stock, which had been agreed upon on August 3, never took place. A series of phone conversations and telegrams ensued during the period from August 5 to August 14. All the details need not be related here. In substance, the obstacles to the completion of the sale were two, i. e., (1) ELS not unnaturally wanted to know precisely how many shares ICC owned and proposed to sell. ICC continued to be vague about this. (2) ELS wanted "documentation" to show when ICC acquired its holdings and how much they cost. ELS wanted to be sure that ICC had not gone into the market and bought more ELS stock after August 3 for the purpose of unloading it on ELS. It also wanted substantiation for Vesco's representation that the cost of the stock to ICC was $42 per share. ICC stalled on furnishing this information and finally on August 14 flatly refused to supply it. That ended the negotiations between the parties.

On August 13, ICC's board of directors had another meeting at which Vesco reported on the state of affairs. He recommended that the board again consider authorizing a tender offer to buy ELS stock. The board was still reluctant. The draft minutes, which defendant claims to be correct, state:

"After discussion it was the judgment of the Board that no tender should be made until the following week and until Mr. Vesco had an opportunity to further discuss the matter with Smith, Barney & Co."

Vesco lost no time in consulting Smith, Barney, who apparently repeated its former advice against making a tender offer against the wishes and without the acquiescence of ELS's management. Vesco disregarded that advice. On August 16 he made an agreement with another brokerage firm of which he is a special partner to act as dealer-manager of the tender offer.

On August 16 ICC filed with the Securities and Exchange Commission the statement required of tender offerors by the new Section 14(d)(1) of the Act.

On August 17 ICC's board of directors adopted formal resolutions approving the documents executed to implement the tender offer, i. e., the dealer-manager agreement, the agreement with the depositary, the form of tender, etc. The court has not been furnished with any minutes of this meeting. It does not appear why the board changed its mind and decided to go ahead with the tender offer despite the obvious lack of acquiescense on the part of ELS's management.

The tender offer was published in several newspapers on August 19.

Meanwhile, as these events were transpiring, the Wall Street Journal, on August 15, published another article. This article quoted Vesco as making the following statement:

"'Our preference is to sell our stock in Electronic Specialty (close to 5% of Electronic's two million shares), but there is no urgency to do this. We will continue to watch the progress of the proposed merger with Carpenter and may, at some point, seek to resume talks with Electronic Specialty.'"

The statement in parentheses, "close to 5% of Electronic's two million shares," was a repetition of the error which had appeared in the Wall Street Journal article of July 31. On the witness stand Vesco denied that he had made this statement to the Wall Street Journal, although he admitted that he had made in substance the other remarks attributed to him by the article. He testified that although the article is dated August 15, he had actually talked with the Wall Street Journal reporter on August 13. This was the very day Vesco had recommended to the ICC board that instead of selling its ELS stock, ICC should make a tender offer, regardless of the lack of acquiescence on the part of ELS's management.[1]

It is manifest that the present action represents an attempt by the management of ELS, notably Burgess, to prevent ICC from taking over the company. It is apparent that Burgess feels that Vesco did not deal candidly and fairly with him. On the present evidence, the court agrees.

■■■ That, however, does not dispose of this motion. Although the corporation has standing to maintain this action, and although it is properly concerned with attempts by outsiders to wrest control from "conscientious corporation officials," (Studebaker Corporation v. Gittlin, 360 F.2d 692, 695 (2d Cir. 1966), nevertheless the issue in this action and on this motion is not whether Vesco misrepresented facts to Burgess as president of ELS, in the course of their private negotiations concerning a merger or concerning a purchase by ELS of ICC's holdings in ELS stock. Section 10(b) and the new Section 14(e) of the Act are intended to offer protection to the persons to whom the tender offer was addressed, i. e., the stockholders of ELS. The issue is whether ICC has misled those stockholders in order to induce them to sell their stock to ICC at $39 per share.

Plaintiffs claim that defendant did mislead the stockholders in two ways: (1) by material falsities and omissions in the written tender offer of August 9; (2) by manipulative devices, apart from the language of the written tender offer.

■■■ As to the first category, plaintiffs claim that the written offer was materially misleading, within the meaning of Section 10(b), Rule 10b–5, and Section 14(e), in the following respects:

1. It fails to state that defendant "and persons acting in concert with defendant," sold a substantial number of shares of ELS stock and "did other acts" in order to lower the market price of ELS stock immediately prior to the tender offer, for the purpose of making the offering price of $39 more attractive.

2. It fails to state that defendant had agreed to sell approximately 50,000 shares of ELS stock to ELS at $42 per share and that defendant had "repudiated" the agreement.

3. The tender offer contained a false statement, i. e.:

"The Company does not have any contracts, arrangements or under-

---

1. After the tender offer was made, there was still another Wall Street Journal article published on August 20 which quoted Singer, defendant's general attorney and assistant secretary, as stating that ICC "hadn't had any discussions with Electronic Specialty since the August 5 announcement." Singer does not deny that he made this statement, but claims in his affidavit that he did not mean literally that ELS and ICC had had no discussions since August 5; what he meant was no discussions relating to a merger.

standings with any person with respect to any security of Specialty, except as set forth herein."

4. It contained another false statement, namely:

"Upon completion of this Offer, the Company will give consideration to a merger between itself or a subsidiary and Specialty."

In the court's opinion, the first three of these contentions are without merit. There is no proof that defendant sold ELS stock in substantial quantities just before the tender offer to bring the market price down and thus make the $39 price more attractive. On the contrary, the only evidence is that it did not.

Similarly, there is no evidence that defendants had contracts or arrangements with other persons (except the routine and necessary arrangements with the dealer-manager, depositary, etc.) pertaining to ELS stock. On the contrary, the only evidence is that it had no such contracts or arrangements.

Presumably, plaintiffs made these allegations because they could not otherwise account for the discrepancy between the number of shares of ELS stock which Vesco led Burgess to believe that ICC owned and the smaller number that it ultimately turned out that ICC did own. This is understandable, but the fact remains that as far as the present evidence discloses, there was no material falsity or omission in the written tender offer in this respect.

■ The court does not consider it materially misleading to fail to tell the stockholders that at one point ICC had been willing to sell its ELS stock to ELS at $42 per share and that ELS had been willing to pay that price for it. The tender offer discloses the fact that the market price of the stock had gone as high as $42 at one point. Knowing that fact, stockholders were advised that in the past, some people at least had been willing to pay $42 for the stock. It was up to them to decide whether or not they wished to sell their stock at $39.

The details of the private negotiations between plaintiffs and defendant and, in particular, whether or not defendant "repudiated" its agreement with ELS, a claim which of course defendant denies, appear to the court to be matters which are of no proper concern to stockholders. They did not need to know them in order to decide whether or not they wished to tender their stock.

■ Plaintiffs' fourth contention has more merit. The regulations promulgated by the Securities and Exchange Commission on July 30, 1968 to implement the new Sections 13(d) (1) and 14(d) (1) of the Act specifically require that tender offers, when the purpose of the offeror, as it is in this case, is to acquire control of a company, shall describe any "plans or proposals which such persons may have * * * to or merge it [the company to be acquired] with any other persons * * *." (Sec.Reg. § 240.14d–1(c), 33 Fed.Reg. 11017 (1968)). Here ICC did have a definite plan to merge ICC and ELS on a share for share basis. Plaintiffs urge, with considerable force, that a merger on such a basis would be disadvantageous to ELS stockholders. It seems probable, in the light of what has transpired, that if ICC does gain control of ELS, it will endeavor to put through such a merger. Under these circumstances, it was less than candid for ICC to state in its tender offer merely that it would "give consideration" to a merger. Upon the evidence here, that minimal disclosure does not comply with the statute and regulations.

■ I turn now to plaintiffs' other claim, i. e., that defendant has engaged in manipulative practices, aside from the language of the tender offer. In essence, plaintiffs charge that defendant, prior to August 19, deliberately led the public to believe that it would not make a tender offer and that it would dump 100,000 shares of ELS stock on the market, thereby depressing the price. It is charged that defendant's purpose in so doing was to frighten ELS stockholders so that when finally on August 19 defendant offered to pay them $39 per

share for their stock, they would be eager to accept the offer. As evidence of such a plan and intent, plaintiffs point to the Dow Jones announcement and to the Wall Street Journal articles previously quoted.

The question is whether plaintiffs have demonstrated a strong probability of success in maintaining this contention at the trial. The evidence does not indicate that defendant's board of directors had such an intention. It appears that at least until August 17, the board was unwilling to authorize the type of hostile tender offer that is being made here.

Vesco, however, is another matter. The court is willing to assume, for the sake of argument, that his Dow Jones announcement on August 5 was made in good faith and that on that day he actually intended to follow the board's instructions to sell the ELS stock rather than to proceed with the tender offer. But his conduct on August 13 is much harder to explain. On that day he recommended to the board that the tender offer go forward. The ultimate trier of the fact in this case could easily find that Vesco intended on August 13 to proceed with the tender offer, in view of the fact that three days later, in disregard of Smith, Barney's advice, he executed the necessary documents to that end. Yet, on the same day, August 13, he informed the Wall Street Journal, in effect, that ICC's intent was to the contrary. He said in substance that:

> "Our preference is to sell our stock in Electronic Specialty * * * but there is no urgency to do this. We will continue to watch the progress of the proposed merger with Carpenter and may, at some point, seek to resume talks with Electronic Specialty."

Even if Vesco did not, as he claims, furnish the erroneous figure of close to 100,000 shares as the amount of ICC's holdings, still the rest of his statement is misleading enough. Moreover, Vesco

knew that the Wall Street Journal had made this same mistake before, on July 31. He did not take this opportunity to correct it. It is hard to see what purpose he could have had in mind in making this statement if it were not to mislead.[2]

In the court's opinion there is substance to plaintiffs' contention on this branch of the case and a reasonable probability that plaintiffs will ultimately succeed at the trial in establishing a violation of the statute.

█ It still remains, however, to consider the "balance of hardships" which are involved in granting or denying a preliminary injunction. See Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840 (2d Cir. 1967)

If a preliminary injunction is granted, in all likelihood it will mean the end of the tender offer which under its terms must be completed by October 17. Not only would this cause loss to defendant by rendering abortive the expense which it has already incurred for fees, etc., but, more important, it might well cause irreparable loss to the tendering stockholders who wish to complete their tenders. Holders of more than 500,000 shares have indicated their desire to sell their stock to defendant at $39 per share. That is near the top of the range of market prices for the stock. If this offer falls through, the stockholders may never get another similar chance. They may wish to take advantage of the present opportunity, regardless of the facts developed at this hearing. To grant a preliminary injunction here might do the stockholders more harm than good.

Conversely, the injury to plaintiffs by denying a preliminary injunction does not seem irreparable, particularly if the trial of this action on the merits is expedited. If plaintiffs succeed at the trial, they should be able to obtain relief against the voting by ICC of its newly acquired stock. See Symington Wayne Corp. v. Dresser Industries, Inc., *supra*.

2. The closing price of ELS stock on August 12 was 36, on August 13 it was 35⅜, and on August 16 it was 34. On August 19, after the tender offer, it closed at 37½.

470

Any other stockholders who may join this class action should be entitled to rescind their tenders.

At a trial, the issues can be fully developed. More witnesses can be called. It may turn out that the impression which this court has gained from the brief hearing on this motion is unjustified.

After much consideration, the court has concluded that the just course to follow here, particularly with a view to the best interests of the tendering stockholders, is to set this case down for trial in the immediate future.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

The motion for a preliminary injunction is denied on condition that the trial proceed at the October Term of this court.

Settle order on notice.