**ELECTRONIC SPECIALTY CO., William H. Burgess and John B. Fitzpatrick, Plaintiffs-Appellants-Appellees,**

**v.**

**INTERNATIONAL CONTROLS CORP., Defendant-Appellant-Appellee.**

Nos. 372–374, 379, Dockets 33073–33075, 33105.

United States Court of Appeals Second Circuit.

Argued Jan. 10, 1969.

Decided Jan. 24, 1969.

David R. Hyde, New York City (Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, Hogan & Hartson, Washington, D. C., Robert M. Jeffers, Washington, D. C., of counsel), for defendant-appellant-appellee.

Jay G. Strum, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, Milton Kunen, New York City, and Allan M. Pepper, New York City, of counsel), for plaintiffs-appellants-appellees.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This the first case in which we or, so far as we are aware, any court of appeals has had to consider the amendment adding to § 14 of the Securities Exchange Act new subsections (d), (e) and (f) dealing with tender offers. Public Law 90–439, § 3, 82 Stat. 455 (1968). The amendment, which should be read in conjunction with the concurrent addition of § 13(d) and (e), proceeds along two general lines. The first is embodied in § 14(d) and (f). Broadly speaking, these provide that if on consummation the offeror will own more than 10% of the securities for which the offer is made, it must file an initial statement with the SEC and subsequent solicitations in favor of or against the offer must also be filed. If a majority of the board of directors are to be replaced without a shareholders' meeting, the issuer of the securities must file the information required by the Proxy Rules. Tenderers are given a brief period within which to change their minds, and the offeror must complete the purchase within a given time or allow tenderers to withdraw. Other provisions, not here relevant, deal with offers for less than all the outstanding securities and with changes in the offer. The second prong of the amendment is § 14(e). In effect this applies Rule 10b-5 both to the offeror and to the opposition— very likely, except perhaps for any bearing it may have on the issue of stand-

ing, only a codification of existing case law. See Jennings and Marsh, Securities Regulation: Cases and Materials 912 (2d ed. 1968).] The SEC moved promptly to implement the amendment by regulations, see SEC Regulations 13D and 14D.

The facts are extensively set forth in the opinion of Judge Lasker in the District Court for the Southern District of New York, 295 F.Supp. 1063, announcing the judgment here under appeal and in an earlier opinion by Judge McLean of that court, 296 F.Supp. 462. We shall confine ourselves at this point to those essential as background and leave others to be related when we discuss points raised on the appeals taken by both sides.

Plaintiff Electronic Specialty Company (ELS) is a California corporation, manufacturing electronic and aerospace components and systems. Its 1,800,000 outstanding shares of common stock are listed on the New York Stock Exchange. Defendant International Controls Corporation (ICC) is a Florida corporation, with its principal office in Fairfield, New Jersey, manufacturing valves, controls, and computer and aircraft parts, and operating airports. Its stock is listed on the American Stock Exchange.

In the first part of 1968 ICC had engaged in a large financing program designed to produce excess cash that could be used for acquisitions. By July 22, 1968, it had some $39,000,000 available for this purpose. It also had discussed with Bank of America the obtaining of a line of credit to facilitate such purchases. ELS was ultimately selected as the most desirable initial prospect. Smith, Barney & Co., whom ICC had consulted, advised Vesco, ICC's president, to acquire something less than 10% of ELS' stock prior to initiating merger negotiations.[1] On July 23 Vesco authorized Butlers Bank of Nassau, The Bahamas, to purchase 100,000 shares at prices less than $40 per share. It had bought 43,500 shares by July 25 when Vesco instructed it to stop buying, since he was meeting plaintiff Burgess, chairman of ELS, in Los Angeles the next day. Meanwhile Bank of America extended a $15 million line of credit and agreed to act as agent in a tender offer.

Meetings of officers of the two companies and their investment advisers were held first in Los Angeles and then in New York over the next few days. ICC's board of directors met on the afternoon of August 1. Reiterating earlier opposition to a tender offer that management would oppose, it authorized Vesco to negotiate with Burgess for a merger on a basis reflecting past market prices or, in the alternative, to negotiate for a tender offer that ELS' management would not oppose; failing either of these solutions, Vesco was to attempt to sell ICC's 43,500 shares to ELS. On Friday, August 2, apparently responding to a report in the Wall Street Journal of July 31, of which more hereafter, ELS stock reached an all-time high of 42⅞ on a volume of 117,600 shares. Smith, Barney advised against proceeding with a tender offer since they thought the price had gone too high.] Vesco agreed, believing that ELS' management would not endorse an offer and, indeed, that it had been instrumental in driving the price of the stock up to a prohibitive level.

[On August 3, Burgess told Vesco for the first time that ELS had been engaged in talks with another corporation and that these were expected to culminate in a merger to be announced that week.] As a result of discussions on August 3 and 4, an oral agreement was made whereby ELS would purchase from ICC up to 50,000 shares of ELS stock at $42 per share.

At 9:48 A.M. on Monday, August 5, the Dow Jones tape reported an agreement to merge ELS and Carpenter Steel

---

1. The reason for keeping below 10% lies in § 16(a) and (b) and in the new § 13(d) (1) of the Securities Exchange Act.

Co.[2] Trading in ELS stock failed to open until 11:30 A.M., apparently because of heavy sell orders. At 10:11 A.M., the tape carried a report that Vesco had said ICC had broken off merger discussions with ELS and had no present plans to use its funds for an ELS tender offer; the report also referred to the Carpenter-ELS announcement. When ELS opened, it was at 38½, off 3½ from the Friday close; Carpenter, on the other hand, traded higher than its previous close. The investment advisers of both ELS and ICC thought the Carpenter deal was worth only $36–$38 to ELS stockholders, and witnesses from Smith, Barney anticipated that the market would discount this by some 10%.

ICC's general attorney told Vesco on Monday that he doubted ICC could compel ELS to go through with the purchase of ICC's shares. On Tuesday Vesco placed a day order to sell up to 10,000 shares at a $35 limit; 5,400 shares were sold. Further discussions took place between ICC and ELS about the latter's acquisition of the former's ELS shares but these were inconclusive, each side charging the other with bad faith. On August 15, in reporting on ICC's acquisition of shares of another company, the Wall Street Journal purported to quote something about ELS said by Vesco early on August 13, which we will discuss below.

ICC's directors met again on the evening of August 13. Vesco reported the facts here outlined, and the views of brokers that, given the market's unfavorable reaction to the ELS-Carpenter merger, a cash tender offer might be well received even though ELS' management opposed it, and his belief that this should be reconsidered by the board.

Instructing Vesco to consult with Smith, Barney, the ICC board directed that no tender offer should be made until the following week and until such consultation had been had. He was to call a board meeting later in the week if he concluded that a tender offer should be made.

On August 14, ICC sent a telegram to ELS designed to probe the latter's willingness to go through with the purchase of ICC's shares; there was no response. The volume of ELS stock traded on August 15 and 16 was subnormal, and the stock reached a low of 33⅛. [On August 15, Vesco concluded that it would be advisable to recommend a tender offer to his board. Smith, Barney declined to act as dealer-manager, being fearful of possible implications of the August 15 Wall Street Journal article and ICC's August 6 sale of stock, but another firm agreed to act.] On Saturday, August 17, ICC's board of directors approved the making of a tender offer on Monday, August 19. Filing with the SEC under § 14(d) (1) of the Securities Exchange Act having already been made, ICC published an offer on August 19 to buy up to 500,000 shares of ELS at $39 per share.[3] The offer was to expire on September 3 unless extended and any tendering stockholder could withdraw at any time before August 26, see § 14(d) (5).

Events took a predictable course. ELS' management first telegraphed and then wrote stockholders and issued a statement to the press advising them against accepting the offer; it also filed charges against ICC with the Securities and Exchange Commission. Discussion centered on the adequacy of a statement in the tender offer and in the SEC filing that "Upon completion of

2. Each ELS share was to be exchanged for a share of a new common stock; each share of Carpenter was to be exchanged for ¾ of a share of a new $2.40 voting preferred, convertible into the new common on a share for share basis, plus ³⁄₁₀ of a share of the new common. The new common was to pay dividends at the initial rate of $.20 per share, which would represent $1.86 for each present Carpenter share as against the current rate of $1.60.

3. Convertible debentures would be purchased at $1,236; these were to be counted against the total on the agreed conversion basis.

this Offer, the Company will give consideration to a merger between itself or a subsidiary and Specialty.'] ICC was then considering the publication of a second advertisement and the filing of an amended Schedule 13D. These, which were filed on August 23, added the words "on the basis of the relative market prices of the common stock of the respective companies during a representative period." The amended advertisements were published on August 25 and 26.

This action was brought on August 27. The plaintiffs were ELS; Burgess, owner of a large number of ELS shares, who had then tendered none and sought to sue on behalf of all holders of ELS common stock and convertible debentures; and Fitzpatrick, who had tendered 100 shares of common stock and sought to sue on behalf of all who had tendered common stock or debentures.[4] On ICC's representing that it would not accept or pay for stock until the close of business on September 3, a temporary restraining order was denied. On September 3, ICC extended the offer to September 6. By the latter date it had received transmittal letters covering somewhat more than 500,000 shares, but many of these merely guaranteed subsequent delivery of the securities. Pursuant to authorization by its directors on September 6, ICC announced on Monday, September 9, that it would extend the offer to Thursday, September 12, and would accept all shares tendered.

Judge McLean conducted a hearing on plaintiffs' application for a temporary injunction on September 6, 9 and 10. The next afternoon ELS sent out a communication to stockholders that if the court should deny plaintiffs' motion, it appeared probable that ICC would obtain working control; that accordingly it was the intention of Burgess, Harmon (President of ELS), and other key officers "to immediately tender their shares and to resign, when and if Inter-

national Controls Corp. exercises control"; and that management must now withdraw its "former recommendation that you not tender your shares" since it was "unable to predict what will happen if the company is taken over by International Controls Corp." The Dow Jones tape on the afternoon of September 11 and the Wall Street Journal of September ·12 characterized this as a declaration of Burgess' and Harmon's intention to resign if the district court denied the injunction.

On the morning of September 12 it did. Judge McLean found no merit in plaintiffs' contentions that the tender offer was materially misleading in allegedly failing to state that ICC and persons acting in concert with it sold a substantial number of ELS shares and did other acts to lower the market price in order to make the $39 offer more attractive, in failing to disclose ICC's agreement to sell 50,000 shares to ELS and its alleged repudiation of this, and in stating ICC had no arrangements with any person with respect to any security of ELS except as stated in the offer. He faulted ICC for the bareness of the statement with respect to merger in the initial offer, see SEC Reg. 14D, Rule 14d–1(c), on the ground that "ICC did have a definite plan to merge ICC and ELS on a share for share basis," which, if viewed from the standpoint of past earnings rather than market prices, would have been disadvantageous to ELS stockholders. He thought also there was a reasonable probability that plaintiffs might ultimately prevail under § 14(e) with respect to Vesco's statement of August 13 to the Wall Street Journal. However, balancing the hardships to ICC and to ELS stockholders who had tendered or wished to tender against the lack of injury to plaintiffs in view of the availability of other relief, such as a later injunction against the voting of the stock, see Symington Wayne Corp. v.

4. Fitzpatrick who had owned 10,100 shares, admitted he had tendered 100 of

these at Burgess' request and without reliance on any statement by ELS.

Dresser Industries, Inc., 383 F.2d 840, 843 (2 Cir. 1967), he denied a temporary injunction on condition that the action be tried at the October term of the court.

Some 570,642 shares of ELS stock and $1,191,000 of convertible debentures were tendered during the day. The former included 129,810 of Burgess' 130,810 shares and 27,765 owned by Harmon. The result of this unexpected burst of tenders, undoubtedly prompted in no small part by management's communication to ELS security holders and the slightly exaggerated account of it in the financial media, was that at the end of the offer the equivalent of some 1,200,000 shares of ELS stock had been tendered—considerably more than ICC expected or wished.

On September 16 ICC forwarded checks aggregating some $48,000,000 in payment for the tendered shares and debentures. These were accompanied by an offer permitting any tenderer (other than Burgess and Harmon) to withdraw before September 24. Appended to the withdrawal offer were copies of the complaint in this action and of Judge McLean's opinion. Only some 1,100 shares were withdrawn. [The small amount of withdrawals may have been due in part to ELS' release, on September 20, of figures showing a drop in earnings for the first half of the year from $2.1 million to $1.4 million or, on a per share basis, from $1.11 to $.74.[5]]

The action was tried before Judge Lasker for 12 days. He upheld the standing of ELS and of Burgess but granted ICC's motion for summary judgment with respect to Fitzpatrick on the ground that ICC's withdrawal offer barred any claims of tendering stockholders. He held the Schedules filed with the SEC could not be faulted for denying any arrangements with other persons with respect to ELS shares or for failing to disclose an intention to use ELS' cash or credit to enable ICC to repay Bank of America—claims not pressed by plaintiffs on this appeal.

He disagreed with Judge McLean's criticism of the statements with respect to merger. [He concluded that ICC had violated both Rule 10b–5 and § 14(e) in that it had misled ELS and the public about its intention to make a tender offer, had made misleading statements about its intention to sell or not to sell its ELS holdings, and had "at the very least allowed the financial media to publish and republish what it knew to be a false statement as to the actual number of shares which it held in ELS."] On the other hand, he declined either to order divestiture or to enjoin voting, and held there was no occasion for directing an offer of rescission since the withdrawal offer had afforded equivalent relief. But he issued an injunction to provide against further violations and for the continued prosecution of the action by present counsel for ELS and Burgess, and directed under F.R.Civ.P. 23(c) that the action be maintained by Burgess as a class action on behalf of ELS' stockholders and debenture holders, reserving questions with respect to the definition of the class, the form of notice, and so forth.

Having been informed of this appeal, the judge, at plaintiffs' request, adjourned the ELS stockholders' meeting that had been scheduled for December 30, 1968, to January 28, 1969. We expedited the appeal. Plaintiffs complain that, having found the issues in their favor, the district court failed to afford them effective relief; defendant argues there was no justification for any relief at all.

## I.

[Defendant contends that the target corporation lacks standing to complain of a violation of § 14(d) or (e) since it can suffer no injury from a change in the ownership of its stock; it contends also that ELS is without standing to complain of violation of Rule 10b–5, an issue we left open in General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 164 (2 Cir. 1968), cert. denied, 393

---

5. Figures for both years excluded the losses of a subsidiary sold in May 1968.

U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). At one point ICC argued that a nontendering stockholder lacked standing on similar grounds, but later abandoned this broad position in favor of a claim that Burgess' conduct disqualified him as a plaintiff. While not disputing that a tendering stockholder would usually have standing, it argues that Fitzpatrick did not have this since he tendered at Burgess' request and without reliance on any statement by ICC, and that even if he had standing, he lost any position when he failed to avail himself of the opportunity for withdrawal. While our holding on the merits makes it unnecessary for us to discuss the issue with respect to Fitzpatrick and indeed might allow us to pretermit the entire question of standing, the issues raised about the standing of the target corporation and nontendering stockholders have such general importance in the enforcement of § 14(d) and (e) as to make an expression of our views desirable.

The district court held, in accordance with a memorandum filed by the SEC as *amicus curiae*, that the target corporation had standing to complain of violations of § 14(d) and (e); since the latter largely tracks the substantive provisions of Rule 10b–5,[6] the court found it unnecessary to determine the standing of the target corporation under that Rule. The decision rested in considerable part on an analogy to § 14(a), which makes it unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors," and under which, as we held in Studebaker Corp. v. Gittlin, 360 F.2d 692 (2 Cir. 1966), a corporation has standing to seek an injunction against violation by a group attempting to gain control. The district judge and the SEC pointed to the fact that the amendment with respect to tender offers took the form of an addition to § 14, and also to language in the House report on the amendment which stated "the cash tender offer is similar to a proxy contest" and emphasized the anomaly of "the present gap in the Federal securities laws which leaves the cash tender offer exempt from disclosure provisions" whereas the proxy contest was not. See H.R.Rep. No. 1711, 90th Cong., 2d Sess. 3, U.S.Code Cong. & Adm.News pp. 2997, 2999 (1968). Reverting to *Studebaker, supra,* they then stressed what we said with respect to § 14(a):

> But the legislative history shows that Congress anticipated protection from "irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials," S.Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934), quoted in 2 Loss, supra at 950, and the Proxy Rules are shot through with provisions recognizing that in contests for control the management has a role to play as such and not merely insofar as the managers are stockholders.

Mere statement is enough to show that while the analogy is persuasive, it is not perfect. The legislative history of the 1968 amendment demonstrates that the focus of legislative interest was on the public shareholder; Congress wanted to ensure that he had the benefit of a full statement from the offeror, with a chance for "incumbent management" to "explain its position publicly," if so disposed, H.R.Rep. No. 1711, *supra,* at 2, U.S.Code Cong. & Adm.News at p. 2998. In a proxy contest the management is almost inevitably a party; indeed § 14(c), added in 1964, mandates that if management does not solicit proxies, it must furnish information equivalent to what would have had to be transmitted if a solicitation were made on its behalf.

6. The primary difference is that whereas Rule 10b–5 has as its final phrase "in connection with the purchase or sale of any security," § 14(e) ends "in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

Furthermore if a holding of standing in the target corporation would mean that a nontendering stockholder would lack this unless he could satisfy the rather cumbersome requirements of F.R.Civ.P. 23.1 concerning derivative actions, the evil would be considerably more serious than under § 14(a). Management can generally be counted on to oppose a mere attempt to dislodge it in a proxy contest, whereas it may well wish to accept a tender offer and the remedy of the individual stockholder might thus be postponed until too late for effective action. If recognition of standing on the part of the target corporation would require us to condition the standing of nontenderers on compliance with Rule 23.1, we thus might very well deny it.

 We do not believe, however, that this choice is forced upon us. In determining who has standing to enforce duties created by statute, a court's quest must be for what will best accomplish the purposes of the legislature. In the instant context the proper solution is not necessarily determined by the rules developed in equity to delimit the circumstances under which a stockholder may assert a claim on his corporation's behalf. When we decided the *Studebaker* case as we did, we had no intention of discrediting an earlier holding that recognized the standing of a non-signing stockholder in a corporation which was the object of proxy solicitation even though there was no allegation that the corporation was in cahoots with the offender. [Union Pacific R. R. v. Chicago & N. W. Ry., 226 F.Supp. 400, 406 (N.D.Ill.1964)] While a nontenderer suffers no immediate injury from inadequacy of price in the sense that he retains his stock, such inadequacy is likely to have a depressing effect on the market for some time and thus may hurt him if, for one reason or another, he should later find it necessary or desirable to sell. Such depression may also harm the target corporation if it should wish to engage in financing or acquisitions, and a still different potential for harm to the corporation will exist where it is claimed that the offeror has evil designs on its treasury or business plans. [The rights of the nontendering stockholder and the corporation thus seem sufficiently independent to give standing to both under all the provisions added to § 14. Cf. Symington Wayne Corp. v. Dresser Industries, Inc., *supra*, 383 F. 2d at 842; Moore v. Greatamerica Corp., 274 F.Supp. 490 (N.D.Ohio 1967). [The hidden question is one of policy with respect to suit by the corporation: Should management be allowed to spend the stockholders' money in resisting a tender offer that may well be advantageous and acceptable to a large majority when a stockholder is free to act in his own behalf and the managers will almost inevitably hold stock on their own account? Militating in favor of an affirmative answer is the very fact of the superior resources of the corporation, which can be vital in this context where remedial action must be speedy and forceful. With the considerations thus in balance we would be reluctant to deny standing when Congress, had it considered the problem, would very likely have thought the rule already recognized under § 14(a) would apply. Moreover, in cases where management causes the corporation to bring a suit motivated by its own interests and contrary to the best interests of the true owners, shareholders have their usual remedies for waste. Cf. Rosenfeld v. Fairchild Engine & Airplane Corp., 309 N.Y. 168, 171, 128 N.E.2d 291, 51 A.L.R.2d 860 (1955).]

II.

Plaintiffs assert that the decision under review is infected by a fatal flaw. The court, they say, has found a number of violations on the part of ICC but has done nothing more than administer a slap on the wrist. They argue that the opportunity afforded by ICC for withdrawal was insufficient, both because the court has now held there were inequities beyond those found by Judge McLean whose opinion was the only one sent to shareholders, and because the sole option afforded an individual stock-

holder was to withdraw under circumstances wherein, because of the inaction of others, ICC might be left in control of ELS. [They say that approval on our part of the pattern here displayed—denial of interlocutory relief because divestiture or prohibition of voting may be later available, followed by denial of these remedies on final hearing because they are too severe—would frustrate the plain intention of Congress to do something effective when it added § 14(d) and (e). ]

We agree with plaintiffs to the extent of believing that the application for a preliminary injunction is the time when relief can best be given. Despite the makeweight argument in the final paragraph of *Symington Wayne, supra,* 383 F.2d at 843, on which Judge McLean naturally relied, [we think that in administering § 14(d) and (e), district judges would do well to ponder whether, if a violation has been sufficiently proved on an application for a temporary injunction, the opportunity for doing equity is not considerably better then than it will be later on.] The court will have a variety of tools usable at that stage. If the filings are defective or the tender offer misleading, the court can require correction, along, of course, with an opportunity to withdraw and an injunction against further solicitation until the period for withdrawal has expired. Since the amount of stock tendered is likely to be smaller at that time, the difficulties with respect to withdrawal described by plaintiffs will at least be less acute than after the offer has been concluded. If the court believes the offeror has improperly depressed the price of the stock before making the offer, it can require rescission and enjoin further solicitation for a period, or allow the offeror the alternative of raising the price for both past and future deposits. We cite these merely as examples; other techniques will doubtless suggest themselves to resourceful judges. [On the other hand, we do not mean at all that interlocutory relief should be given lightly. To the contrary, district judges must be vigilant against resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers. ]Recognizing the heavy burden all this entails on district judges, particularly in the Southern District of New York where so much of this litigation occurs, and to a lesser extent on this court as well, we think the need for prompt and judicious handling of applications for temporary injunctions in cases arising under § 14(d) and (e) is an inevitable consequence of the new statute.

On the other hand we must agree with defendant that even if it had violated § 14(e) in the manner found by the district court, the judge was well within the bounds of discretion in denying divestiture or sterilization. Courts cannot too often recall the statement in *Hecht Co. v. Bowles,* 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944):

> The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

It is not irreverent to cite also the admonition of an equally exalted authority whose "object all sublime" was to "let the punishment fit the crime."

To afford an opportunity for withdrawal would be the idlest of gestures now, since the ELS stock purchased by ICC at $39 is selling around $26–$27, and compulsory rescission is out of the question. Divestiture of 1,200,000 shares of ELS probably would involve certain and huge loss. Even if ICC could find a purchaser at the present market, the amount of loss would approach $15,000,000. If the stock had to be sold in small quantities over a period, ICC would likely suf-

fer still greater loss and the prospect would hang heavy over the nontendering stockholders of ELS. Permanent deprivation of voting rights and an injunction against the solicitation of proxies would be just as detrimental. This would simply be a disguised method of forcing divestiture, and it would be decidedly unhealthy to leave the direction of an enterprise to 45% of the stock, especially when the management has sold out. There is also the seeming inequity in administering such strong medicine to an offeror when no such remedy would be available against management for violations in opposing the offer.[7] Moreover, none of these remedies would get the tendering stockholders the higher price on which ELS claims they would have insisted if ICC had not depressed the market. Yet no one has had the temerity to suggest that ICC now be required to raise the price to a figure it was never willing to pay.

### III.

In our view Judge Lasker's denial of the relief sought by the plaintiffs was justified on another ground. We do not believe ICC violated the securities laws. Before we deal with the particulars, it may be useful to outline some general considerations relevant in application of the new statute.

■ The likeness of tender offers to proxy contests is not limited to the issue of standing. They are alike in the fundamental feature that they generally are contests. This means that the participants on both sides act, not "in the peace of a quiet chamber," Hellenic Lines Ltd. v. Brown & Williamson Tobacco Corp., 277 F.2d 9, 13 (4 Cir.), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed. 2d 102 (1960), but under the stresses of the market place. They act quickly, sometimes impulsively, often in angry response to what they consider, whether rightly or wrongly, to be low blows by the other side. Probably there will no

more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. These considerations bear on the kind of judgment to be applied in testing conduct—of both sides— and also on the issue of materiality. As to this we reaffirm the test announced in *Symington Wayne, supra,* 383 F.2d at 843, whether "any of the stockholders who tendered their shares would probably not have tendered their shares" if the alleged violations had not occurred. See also General Time Corp. v. Talley Industries, Inc., *supra,* 403 F.2d at 161–162.

■ We shall deal first with the point as to which Judge McLean thought there was a violation but Judge Lasker thought there was not—the statements with respect to merger. As previously noted, the regulations issued by the SEC require the maker of a tender offer to "describe any plans or proposals which such persons may have to * * * merge it [the target corporation] with any other persons." SEC Rule 14d–1(c) & Schedule 13D. It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them. As we read the record, ICC put forward merger early in the game as an alternative that, perhaps because of tax considerations to the stockholders, might be more acceptable to ELS than a tender offer, which ICC's directors then insisted could be made only if ELS agreed. Nothing in this committed ICC to propose a merger as a consequence of a successful "overhead" tender offer or evidenced a firm intention that it would. If ICC acquired control as a result of a tender offer, the circumstances might or might not suggest a merger—an issue that could and presumably would be explored with the

---

7. Although the "dirty hands" defense might be available to the offeror, the innocent stockholder would find cold comfort in a result that because both the offeror and the management had violated the statute all relief should be denied.

deliberation then possible. The statement in the August 19 offer that ICC would "give consideration" to a merger in the event of success thus seems entirely accurate and the subsequent elaboration unnecessary. No one suggests, however, that the revised statement that any merger would be "on the basis of the relative market prices of the common stock of the respective companies during a representative period" was any less satisfactory. Agreeing with Judge Lasker on this issue, we now turn to his conclusion that ICC violated § 14(e).

 The first item charged against ICC is a part of Mr. Dan Dorfman's "Heard on the Street" column in the Wall Street Journal of July 31, which we reproduce in the margin.[8] No claim is made that ICC was the source of this comment; indeed it would be hard to think of anything more detrimental to the potential maker of a tender offer, and ICC naturally had its own ideas about the source. What "was said to be" ICC's holdings overstated the fact (100,-000 vs. 43,500), and the "reports" that ICC intended to offer between $45 and $50 per share were without foundation. The claim is that ICC was under a duty to correct these. [While a company may choose to correct a misstatement in the press not attributable to it, cf. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 857–864, 866–869 (concurring opinion) (2 Cir. 1968), we find nothing in the securities legislation requiring it to do so.] This is particularly true when the misstatement relates to its plans in regard to another company and it has reason to think the comment was an effort by the target corporation to obtain disclosure before the time Congress had stipulated. Certainly the errors in the comment did not have the effect of depressing ELS stock. Rather the exaggerated prediction of the tender price drove it to an all-time high and aborted a tender offer for the time being.

 The next two episodes, which we can consider together, are ICC's release on the Dow Jones broad tape on August 5 immediately following the announcement of the ELS–Carpenter merg-

8. "The stock of Electronic Specialty, which has jumped about 50% in price since mid-April continued its upward movement yesterday.

"The issue spurted 1¼ to 40⅜ on a turnover of 25,000 shares. Its high for the year is 42¼; its low, 25⅝.

"Wall Streeters attributable much of the stock's sharp rise to rumors of a possible take-over attempt. There were reports yesterday that a tender for control of the concern might be forthcoming within a week at between $45 and $50 a share.

"The company behind the bid was rumored to be International Controls (American), a junior conglomerate with interests in the fluid power, computers and aerospace fields. Its stock was off ⅜ yesterday to 39⅛.

"According to brokerage house reports, International Controls, whose 1967 volume was less than a tenth of Electronic Specialty's $100 million-plus volume last year, has already taken a stock position in the concern. This position was said to be about 5% of Electronic Specialty's roughly 2 million shares outstanding.

"Electronic Specialty, based in Los Angeles, is a diversified manufacturer whose products include electronic components and heating and cooling systems.

"The presidents of the firms weren't immediately available for comment.

"International Controls, whose stock moved from over the counter to the American Stock Exchange in early May, has turned in a spectacular market performance. From a low of 2½ in 1967, the stock this year has gone as high as 50⅞. Its 1968 low is 16½.

"A few months ago, Robert L. Vesco, International's president, predicted the company's 1968 profit, based on a number of acquisitions, would at least triple the 1967 net of $678,580, or 31 cents a share, which was achieved on volume of $6.8 million.

"Electronic Specialty last year earned $2.6 million, or $1.42 a share, on sales of $112.4 million. Some Wall Street estimates put the company's 1968 net in the area of $1.80 a share, on sales of roughly $125 million.

"A number of analysts view Electronic Specialty's stock 'fully priced' on its near-term prospects. Some, in fact, see the prospects of a sharp selloff in the stock should a take-over bid fail to materialize in the not-too-distant future."

er,[9] and its sale of 5,400 ELS shares on August 6. When, these are placed in their setting, no violation of the statute can be discerned. In light of the previous publicity concerning a prospective tender offer by ICC for ELS, stockholders of both companies had a natural interest in knowing ICC's response to the merger. Vesco said ICC was bowing out. That was what his board had instructed him to do, and we find no evidence it was not what at that moment of time he intended to do. If this true statement contributed to the decline in the price of ELS' stock, that was simply because the market appraised the merger as less attractive than the potential tender offer ELS had done everything possible to discourage. In fairness to his own stockholders Vesco also could not simply ignore the problem of ICC's investment of over $1,500,000 in 43,500 shares of ELS. Whatever ELS' oral commitment to take these off his hands had been, his attorney properly advised it was unenforceable. His directors had told him to get rid of the stock if a merger or tender offer could not be agreed upon, and the price was going down as a result of ELS' own doings. If Vesco's objective had been to depress the price rather than to hedge ICC's risks, he surely could have found better means than a day order to sell less than a quarter of ICC's holdings at a limit that was midway between the high and low for the day.

■■■ The last and somewhat more serious point in the bill of particulars concerns an item in the "Heard on the Street" column of August 15. The bulk of the column related to ICC in general and to its probable acquisition of a controlling block of a savings and loan association in particular.[10] But it also contained a reference to ELS which we quote in the margin.[11] Vesco denied that he had made any statement about the amount of ICC's holdings in ELS, and speculated that the newspaper had carried over its own estimate from the July 31 article. He claimed also that he had not used the word "preference" but had said only that ICC would continue to entertain offers to buy its ELS stock. Dorfman was not called to testify.

The reason why the district judge took a serious view of this article was that by August 15 Vesco's interest in a tender offer had revived. As early as August 6 he had talked to Smith, Barney about possible reconsideration in light of the unfavorable market response to the ELS–Carpenter merger, but no conclusions were reached. We have outlined subsequent developments above. Suffice it here to say that when Vesco spoke to Dorfman on August 13 and when the article appeared on August 15, ICC's plans with respect to a tender offer were in flux. The August 1 meeting of the directors had vetoed an overhead offer; the

9. "Robert L. Vesco, president of International Controls Corp., said that exploratory merger discussions held with Electronics Specialty Co. have been terminated.

"Mr. Vesco said the discussions were broken off by International Controls—

"International Controls—which recently obtained 40 million dls from public and private placements of its securities both in the U. S. and abroad—has said it has no present plans to use those funds for a tender offer as had been recently rumored.

"Mr. Vesco stated however that International Controls Corp. would continue to explore merger and acquisition possibilities with other companies.

"Earlier today Carpenter Steel and Electronic Specialty announced they had agreed to merge."

10. Mr. Dorfman's interview with Vesco, which was the basis for the column, took place on August 13. Publication was withheld until the transaction with the savings and loan association had been closed.

11. "Asked about International Controls' position on Electronic Specialty, which turned down a merger bid from International and agreed instead to a merger with Carpenter Steel, Mr. Vesco said: 'Our preference is to sell our stock in Electronic Specialty (close to 5% of Electronic's two million shares), but there is no urgency to do this. We will continue to watch the progress of the proposed merger with Carpenter and may, at some point, seek to resume talks with Electronic Specialty.'"

August 13 meeting, a half day after Vesco had talked to Dorfman, reserved decision; while Vesco made up his own mind on August 15, he did not receive approval from the board until Saturday, August 17; and the offer was made early on August 19, the next trading day.

■■■ We can agree that the word "preference," which Vesco denied using, was inaccurate, at least as a statement of Vesco's personal views although not necessarily of the company's, without subscribing to the sinister conclusion drawn from this. To our minds the episode reflects the difficulties commonly experienced in answering skilled and energetic reporters who seek more definiteness than there is, and the frailties inevitable in human communication, here illustrated also by the later inaccurate reporting of the intention of ELS' management to resign. There is no suggestion that Vesco sought to be interviewed about ELS; the article says the contrary and no one has claimed otherwise. Vesco could not properly have answered that ELS was planning another tender offer; at the time of the interview he had been instructed to the contrary and, even when the article appeared, the matter was still under advisement by ICC's board. If he had desired to drive down the price of ELS stock, he would hardly have said there was "no urgency" about the sale or have indicated that talks between the two companies might be resumed. We are likewise unable to understand how a violation can be found in the failure to insist on a further statement before the tender offer was announced. Apart from what we have said earlier, Vesco had no authority to announce an offer until Saturday, August 17, and the offer was made in the morning papers on the next trading day. While correction of the amount of ICC's holdings might have been made, a good reporter would scarcely have been satisfied with that and further discussion would have been as likely to worsen the situation as to better it. Moreover there is no evidence that this error was material. Whether 100,000 shares or only 38,100

were overhanging the market was scarcely consequential when Vesco had made clear that sales were not imminent. While ELS stock declined somewhat on August 15 and maintained about the same level on August 16, the prices were what the analysts predicted as a result of the Carpenter proposal, and volume was low. To be sure, prices would doubtless have taken a different course if Vesco had insisted on a statement to the effect that since the interview he had asked his board to give further consideration to a tender offer and that it had reserved decision, but the law did not require that. One can readily contemplate what would be claimed if such a statement had been published, ELS stock had sharply risen, and no offer had been made.

Against all this, plaintiffs rely on a statement by the district judge that:

ICC misled both ELS and the public as to its actual intention to make a tender offer. With a rare and momentary lapse only, it is clear that from mid-July on it was ICC's unswerving intention, carried out by its chief executive officer and dominating personality, Vesco, to acquire control of ELS by one means or another, and by a hostile tender offer if nothing else would work.

We note initially that while the concession of "a rare and momentary lapse" does not sound impressive, it is exceedingly so. The period of the "lapse" must include the Dow Jones release of August 5 and, as Judge Lasker recognized, the sale of the 5,400 shares on August 6, and this leaves as the only instance of alleged misleading the Wall Street Journal article of August 15 just discussed. We note secondly that insofar as the statement implies that ICC's intentions are to be identified with Vesco's, we find no basis for it in the record, which demonstrates rather that while Vesco's personal desires may have outrun his board's, he manifested punctilious regard for its authority. If the quoted statement be deemed within F.R.Civ.P. 52(a), we are thus constrained to say that a finding that ICC, or even Vesco, had an "un-

swerving intention" from mid-July on to gain control "by a hostile tender offer if nothing else would work" cannot withstand the scrutiny, limited though it be, which an appellate court is nonetheless bound to give. Rather the record compels a conclusion that the prospect of a hostile tender offer as a likely eventuality revived in Vesco's mind only after the unfavorable market response to the Carpenter merger ELS' management had arranged, that even he had reached no decision by August 13, and that such an offer was not approved by the ICC board until August 17.

 It follows that ICC's appeal from the grant of a limited injunction must be sustained. And although the denial of its motion for summary judgment would not itself be appealable, the case falls within the principle that when an appeal from the issuance of an injunction discloses the absence of equity in the bill, the proper disposition is not simply to reverse the injunction but to direct dismissal of the complaint. Metropolitan Water Co. v. Kaw Valley Drainage District, 223 U.S. 519, 523, 32 S.Ct. 246, 56 L.Ed. 533 (1912); Guardian Trust Co. v. Kansas City Southern Ry., 171 F. 43, 51 (8 Cir. 1909); Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp., 308 F.2d 196, 200 (2 Cir. 1962); Zentner v. American Fed'n of Musicians, 343 F.2d 758 (2 Cir. 1965).

On plaintiffs' appeal the denial of the requested relief is affirmed; on defendant's appeal the order granting an injunction is reversed with directions to dismiss the complaint. In light of the imminence of the ELS stockholders' meeting, the mandate will issue forthwith.

FEINBERG, Circuit Judge (concurring and dissenting):

I concur in Parts I and II of the court's opinion. I dissent from much of Part III, because I cannot join in the disregard of the district court findings of misleading conduct by defendant, particularly those concerning the interview on August 13, 1968, of defendant's president, Vesco.

This case was heard in the trial court by two district court judges. In September, Judge McLean heard evidence on plaintiffs' motion for a preliminary injunction on three separate days; two months later, the action was tried before Judge Lasker for twelve days. After listening to Vesco and other witnesses, both judges concluded that Vesco's statement of August 13 to the Wall Street Journal was an attempt to mislead the public. In order to appreciate fully the error in overturning the findings of the district court, it is necessary to set them out at some length.

This is what Judge McLean found:

But his [Vesco's] conduct on August 13 is much harder to explain. On that day he recommended to the board that the tender offer go forward. The ultimate trier of the fact in this case could easily find that Vesco intended on August 13 to proceed with the tender offer, in view of the fact that three days later, in disregard of Smith, Barney's advice, he executed the necessary documents to that end. Yet, on the same day, August 13, he informed the Wall Street Journal, in effect, that ICC's intent was to the contrary. He said in substance that:

"Our preference is to sell our stock in Electronic Specialty * * but there is no urgency to do this. We will continue to watch the progress of the proposed merger with Carpenter and may, at some point, seek to resume talks with Electronic Specialty."

Even if Vesco did not, as he claims, furnish the erroneous figure of close to 100,000 shares as the amount of ICC's holdings, still the rest of his statement is misleading enough. Moreover, Vesco knew that the Wall Street Journal had made this same mistake before, on July 31. He did not take this opportunity to correct it. It is hard to see what purpose he could have had in mind in making this statement if it were not to mislead.

In the court's opinion there is substance to plaintiffs' contention on this branch of the case and a reasonable probability that plaintiffs will ultimately succeed at the trial in establishing a violation of the statute. [Footnote omitted.]

Judge Lasker considered the matter at much greater length and reached a similar, but more definite, conclusion. He found:

On August 13th, Vesco was again interviewed by the Wall Street Journal's writer for "Heard on the Street." The interview was published on August 15th and included the following statement:

"Asked about International Controls' position on Electronic Specialty, which turned down a merger bid from International and agreed instead to a merger with Carpenter Steel, Mr. Vesco said: 'Our preference is to sell our stock in Electronic Specialty (close to 5% of Electronic's two million shares) but there is no urgency to do this. We will continue to watch the progress of the proposed merger with Carpenter and may, at some point, seek to resume talks with Electronic Specialty.'"

The very night of the interview (August 13) ICC's Board of Directors met and, according to its minutes, Vesco recommended to the Board that a tender offer should be reconsidered and that ICC stood an excellent chance of successfully tendering for 25% of ELS' stock. The Board did not turn a deaf ear but advised Vesco to wait a week and to consult with Smith, Barney in the interim.

On August 16th, after extensive discussions with ICC, Smith, Barney declined to act as dealer-manager for the ELS tender offer and Mr. Dugan testified that their reason was "general doubts in our minds as to the possible implications of the reading of The Wall Street Journal which appeared on August 15th * * *." Disregarding these views and Smith, Barney's repeated advice against a hostile tender offer, Vesco proceeded to arrange that day for another brokerage firm, of which he was a limited partner, to act as dealer-manager of the tender offer.

Also on August 16th, ICC filed with the Securities and Exchange Commission, Schedule 13–D required of tender offerers by Section 14(d) (1) of the Act.

On August 17th, Vesco swung ICC's Board of Directors over. * * *

On August 19th, the tender offer was published in New York, Los Angeles and San Francisco.

The judge further found:

(1) ICC misled both ELS and the public as to its actual intention to make a tender offer. With a rare and momentary lapse only, it is clear that from mid-July on it was ICC's unswerving intention, carried out by its chief executive officer and dominating personality, Vesco, to acquire control of ELS by one means or another, and by a hostile tender offer if nothing else would work. Even on the occasion of the one momentary lapse, when Vesco placed a day order for sale of 10,-000 shares of ICC's ELS stock, the order was not pursued thereafter because he was advised that any sale might prejudice a later tender offer. Clearly, therefore, the intention to tender was the controlling element. Further, it must be remembered that ICC was under a compelling necessity to invest its funds, and the record is barren of evidence as to any other vehicle for such investment. In spite of this unswerving intention, ICC, through Vesco, made misleading statements on several key occasions, in private discussions with ELS and in public releases, claiming that it had no intention of proceeding to a tender offer, when it in fact did.

(2) ICC made misleading statements as to its intention to sell or not to sell its ELS holdings.

It is clear, therefore, that Judge Lasker found that Vesco intended on August

13 to go through with the tender offer but deliberately gave the interviewer a contrary impression. (The obvious reason, of course, would be to keep the price down so that the tender offer would be more attractive when made.) No matter how phrased, these are findings of fact which are supported by the record and should not be overturned; if they stand, Vesco's conduct was clearly improper. But the effect of Part III of the majority opinion is not only to minimize the whole episode—contrary to the thrust of the new legislation—but to preempt the trial court's function in this significant area. The importance of not doing that is emphasized by Part II of the opinion, where my brothers wisely point out to the district judges that in administering section 14(d) and (e), "the opportunity for doing equity" may be greater while the tender offer is still in process. In other words, the district court judges are told to use their resourcefulness in the "prompt and judicious handling of applications for temporary injunctions" in this difficult area. If, at the same time, this court will subject the findings and conclusions of the trial judges to unrealistic scrutiny, then the advice is self-defeating.